## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------x
                             :
KEEPERS, INC., d/b/a KEEPERS, :
f/k/a Sidepockets, Inc., a   :
Connecticut Corporation;     :
and AFTER DARK LLC., d/b/a   :
ROMANTIX ADULT EMPORIUM, a   :
Connecticut Limited Liability :
Company,                     :
                             :
          Plaintiffs,        :
                             :
v.                           :   CIV. NO. 3:07CV1231(AWT)
                             :
THE CITY OF MILFORD,         :
CONNECTICUT, a Municipal     :
Corporation,                 :
                             :
          Defendant.         :
                             :
-----------------------------x
```

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Keepers, Inc. ("Keepers") is a Connecticut corporation operating a cabaret-style nightclub in Milford. The establishment features live clothed and semi-nude dancing for adult patrons. Plaintiff After Dark LLC ("After Dark") does business as Romantix Adult Emporium, a retail adult entertainment establishment that sells, exhibits, and distributes erotic books, magazines, video tapes and motion picture filmfare. Defendant City of Milford (the "City") is a municipal corporation chartered under the laws of the State of

-1-

Connecticut. The parties have filed cross motions for summary judgment relating to the constitutionality of two versions of a City ordinance regulating sexually oriented businesses.

The plaintiffs challenge the constitutionality of the ordinance arguing that it violates the First Amendment (as an impermissible prior restraint, an undue burden on protected expression, overbroad, and an impermissible impairment on the right to freely associate); the Fourth Amendment; the Takings Clause of the Fifth Amendment; the Ninth Amendment; and the Fourteenth Amendment (as vague as-applied, facially vague, and causing a deprivation of liberty interests without due process). They also contend it violates Conn. Gen. Stat. § 8-2.

For the reasons set forth below, the plaintiffs' motion for partial summary judgment is being granted in part and denied in part, and the defendant's motion for summary judgment is being granted in part and denied in part.

I.   **FACTUAL BACKGROUND**

Joseph Regensberger assumed ownership of Keepers in approximately January 2001. The business was operating as a restaurant and bar at the time under the name "Sidepockets." In 2003, Regensburger decided to convert Sidepockets into an adult cabaret. This renovation involved removing the kitchen to make room for a dressing room for dancers. The conversion also

included building a stage, putting in carpets, building a DJ booth, and making a VIP area. At the time, adult cabarets such as Keepers were subject to Milford's Ordinance Regulating Adult Oriented Establishments, promulgated in 1996.

In 2003, the City passed an amendment to Chapter 2.3 of the City Ordinance Regulating Adult-Oriented Establishments. Keepers believed the provisions of the 2003 ordinance to be more restrictive than those of the 1996 ordinance.

Around this time, Regensberger agreed to a suspension of Keepers' liquor license for four days as a result of alleged violations on the premises such as dancers improperly exposing and touching themselves, and various other violations occurring in March 2003. In 2007, Regensberger lost his liquor license in Connecticut as a result of prostitution activities occurring in 2005 at another adult entertainment business he owned. His inability to hold a liquor license, coupled with the more restrictive 2003 ordinance, contributed to Regensberger's ultimate decision to sell Keepers to one of his employees, Angela Silano, for $250,000 in 2008. Regensberger assists Silano in this litigation in an unpaid capacity.

Romantix Adult Emporium (operated by After Dark LLC) has a main retail floor where merchandise is displayed, and an adult "arcade" in the rear of the establishment which consists of

-3-

enclosed private booths outfitted for the viewing of adult
movies. After Dark joins Keepers in its claims relating to the
2007 ordinance, but not the 2003 ordinance.

In 2003, the Milford Board of Aldermen voted to amend the
1996 Ordinance Regulating Adult-Oriented Establishments. At the
meeting, various members of the community spoke in favor of the
amendment, voicing concerns about the potential deleterious
effect sexually oriented businesses[1] might have on their
community. At the meeting, the then-city attorney Marilyn Lipton
submitted materials for the Board to consider regarding the
secondary effects of sexually oriented businesses in formulating
the amendment. In enacting the amendment in August 2003, the
Board stated that "this ordinance is based on evidence of the
adverse secondary effects of adult uses that is within the
common knowledge of municipalities and is widely reported in
judicial opinions, media reports, land use studies, and crime
impact reports made available to the Board of Aldermen."
Milford, Conn., Ordinances § 2.3-1(1) (2003) (Pls.' Mem. Supp.
Mot. Summ. J. Ex. B). Among other changes, the 2003 ordinance
included a section entitled "Additional regulations concerning

---

[1] The 2003 and 2007 ordinances speak in terms of Adult Oriented
Establishments, but because much of the case law on this topic as well
as the briefing by the parties uses the term "sexually oriented
business" or "SOB", the court uses the term "sexually oriented
business."

live public nudity on premises." Id. at § 2.3-3(7). This section

provides:

> A.   It shall be a violation of this Chapter for a patron, employee, or any other person to knowingly or intentionally, in an adult-oriented establishment, appear in a state of nudity, regardless of whether such public nudity is expressive in nature.

> B.   It shall be a violation of this Chapter for a person to knowingly or intentionally in an adult-oriented establishment, appear in a semi-nude condition unless the person is an employee who, while semi-nude, shall be at least six (6) feet from any patron or customer and on a stage at least eighteen (18) inches from the floor. . . .

> C.   It shall be a violation of this Chapter for any employee, while semi-nude in an adult-oriented establishment, to knowingly or intentionally receive any pay or gratuity by direct physical contact with any patron or customer or for any patron or customer to knowingly or intentionally pay or give any gratuity by direct physical contact with any employee, while said employee is semi-nude in the adult-oriented establishment.

> D.   It shall be a violation of this Chapter for any employee, while semi-nude in an adult-oriented establishment, to knowingly or intentionally touch a customer or the clothing of a customer.

Id. The 2003 ordinance also included language requiring sexually

oriented businesses to allow periodic inspections by the City,

see id. at § 2.3-3(6), and preventing applicants for a license

under the ordinance from being approved if the applicant has

been convicted of, or pled nolo contendre to, certain sexually-related crimes. See id. at § 2.3-4(3)(i).

Keepers filed suit in 2003, alleging that these regulations are unconstitutional. (See Sidepockets, Inc., d/b/a Keepers v. City of Milford, No. 3:03-cv-2134(AWT).) During the pendency of the litigation, the City repealed the 2003 ordinance and enacted a superseding ordinance on May 7, 2007. (See Milford, Conn., ordinances ch. 2.3 (2007) (Pls.' Mot. Summ. J. Ex. C.).) The City then filed a motion to dismiss Keepers' case as moot, which was denied.

The Board of Aldermen considered additional material on secondary effects when passing the 2007 ordinance, but the ordinance retains roughly similar prohibitions on nudity, touching, space requirements between patrons and dancers ("buffer zones"), receipt of gratuity, and licensing as were in the 2003 ordinance. (See ch. 2.3 (2007).) The 2007 ordinance also places more stringent requirements on operators of booths intended to exhibit sexually explicit films or videos ("adult arcades"). For instance, the 2007 ordinance requires brighter illumination in viewing booths and requires that:

> the interior of the premises shall be configured in such a manner that there is an unobstructed view from an operator's station of every area of the premises, including the interior of each viewing room . . . to which any patron is permitted access for any purpose. . . . The view required . . . must be by direct line

of sight from the operator's station. It is the duty
of the operator to ensure that at least one employee
is on duty and situated in each operator's station at
all times that any patron is on the premises. It shall
be the duty of the operator . . . to ensure that the
view area specified in this paragraph remains
unobstructed by any doors, curtains, walls,
merchandise, display racks or other materials or
enclosures at all times that any patron is present . .
. .

§ 2.3-13(a)(7) (2007). Keepers, joined by After Dark, filed a

second action challenging the constitutionality of the 2007

ordinance. The claims in the previous suit concerning the 2003

ordinance were joined with the claims in this case.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the

court determines that there is no genuine issue of material fact

to be tried and that the facts as to which there is no such

issue warrant judgment for the moving party as a matter of law.

Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22

F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry

of summary judgment . . . against a party who fails to make a

showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will

bear the burden of proof at trial." Celotex Corp., 477 U.S. at

322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing

-8-

law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern

-9-

v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997)
(internal quotation marks omitted) (quoting Western World Ins.
Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).
Moreover, the "mere existence of a scintilla of evidence in
support of the [nonmovant's] position will be insufficient;
there must be evidence on which [a] jury could reasonably find
for the [nonmovant]." Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the
allegations in its pleadings since the essence of summary
judgment is to go beyond the pleadings to determine if a genuine
issue of material fact exists. See Celotex Corp., 477 U.S. at
324. "Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,"
Weinstock, 224 F.3d at 41, if the movant demonstrates an absence
of such issues, a limited burden of production shifts to the
nonmovant, who must "demonstrate more than some metaphysical
doubt as to the material facts, . . . [and] must come forward
with specific facts showing that there is a genuine issue for
trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067,
1072 (2d Cir. 1993) (quotation marks, citations and emphasis
omitted). Furthermore, "unsupported allegations do not create a
material issue of fact." Weinstock, 224 F.3d at 41. If the
nonmovant fails to meet this burden, summary judgment should be

-10-

granted.  If the nonmoving party does not respond to the motion, the court may accept as true the moving party's factual statements. <u>See</u> D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in [the moving party's Rule 56(a)1] statement will be deemed admitted unless controverted....). Even if the motion is unopposed, however, the court will not grant summary judgment unless it determined that the moving party is entitled to judgment as a matter of law. <u>See</u> <u>Vermont Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 242 (2d Cir. 2004).

**III. DISCUSSION**

    **A.**   <u>**Mootness of Claim re 2003 Ordinance**</u>

    The defendant contends that the court lacks subject matter jurisdiction to hear Keepers' constitutional challenge to the 2003 ordinance, because the City's repeal of the ordinance, effective May 18, 2007, rendered Keepers' challenge moot. Keepers maintains that its claim for nominal damages pursuant to its claim based on the 2003 ordinance is justiciable upon proof of a substantive constitutional violation.[2]

    "Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable." <u>Stokes v. Vill. of Wurtsboro</u>, 818 F.2d 4, 6 (2d Cir. 1987); see also <u>Beyah</u>

---

[2] While Keepers did not specifically claim nominal damages in the complaint, the court considers its claim for "damages" as including a claim for nominal damages. <u>See</u> <u>Dean v. Blumenthal</u>, 577 F.3d 60, 66 n.3 (2d Cir. 2009) ("Although Dean's complaint seeks only 'damages,' this term can include nominal damages.").

v. Coughlin, 789 F.2d 986, 988-89 (2d Cir. 1986) (holding that an allegedly unconstitutional practice, which no longer affects plaintiff, "may well moot [plaintiff's] claims for declaratory and injunctive relief" but does not moot the request for damages). Additionally, "nominal damages are available in actions alleging violations of constitutionally protected rights." Fox v. Bd. of Trs. of the State Univ., 42 F.3d 135, 141 (2d Cir. 1994); see also Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308-09 n.11 (1986) (noting that nominal damages are recoverable for violation of First Amendment rights without proof of actual injury); Buckhannon Bd. & Care v. W. Va. Dept. of Health & Human Res., 532 U.S. 598, 608-09 (2001) ("[S]o long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case."). The court concludes that Keepers' challenge to the repealed 2003 ordinance is not moot.

Therefore, the City's motion for summary judgment on the basis that the challenge to the 2003 ordinance is moot is being denied.

### B.   First Amendment – Undue Burden on Protected Expression

The plaintiffs and the defendant each move for summary judgment on the claim that the 2003 and 2007 ordinances

constitute an undue burden on protected expressive conduct in violation of the First Amendment.

The First Amendment, which applies to the states through the Fourteenth Amendment, see Thornhill v. Alabama, 310 U.S. 88, 95 (1940), provides, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. Amend. I. Speech may include expressive conduct. See, e.g., Texas v. Johnson, 491 U.S. 397, 404-06 (1989); Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).

Adult entertainment, such as that the plaintiffs provide, is protected expression under the First Amendment, however the Supreme Court has consistently held that nude dancing and the presentation of adult media is expressive conduct that "falls within the outer ambit of the First Amendment's protection." City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000); see also Barnes v. Glen Theatre, Inc., 501 U.S. 560, 565-66 (1991) (Nude dancing "is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so."); Schad v. Mount Ephraim, 452 U.S. 61, 66 (1981) ("[N]ude dancing is not without its First Amendment protections."); American Mini Theaters, 427 U.S. 50, 71 (1976) (stating that "the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest

-13-

that society's interest in protecting this type of expression is
of a wholly different, and lesser, magnitude than the interest
in untrammeled political debate"). Thus, municipal ordinances
that regulate nude dancing and the presentation of adult media
are subject to constitutional scrutiny.

Regulations of speech based on content "are presumptively
invalid," but may be upheld if the restriction passes strict
scrutiny. Hobbs v. Cnty. of Westchester, 397 F.3d 133, 149 (2d
Cir. 2005), cert. denied, 546 U.S. 815 (2005) (quoting R.A.V. v.
City of St. Paul, 505 U.S. 377, 382 (1992) and citing Boos v.
Barry, 485 U.S. 312, 321 (1988)). However, regulations of speech
on a basis other than content receive intermediate scrutiny
analysis. See, e.g., Pap's A.M., 529 U.S. at 289; City of Los
Angeles v. Alameda Books, Inc., 535 U.S. 425, 440 (2002)
(plurality opinion); Ward v. Rock Against Racism, 491 U.S. 781,
798 n.6 (1989); United States v. O'Brien, 391 U.S. 367, 377
(1968); Hobbs, 397 F.3d at 149.

To determine whether a regulation of expressive conduct is
based on content or is content-neutral:

> The principal inquiry . . . is whether the government
> has adopted a regulation of speech because of
> disagreement with the message it conveys. Government
> regulation of expressive activity is content neutral
> so long as it is justified without reference to the
> content of the regulated speech. A regulation that
> serves purposes unrelated to the content of expression
> is deemed neutral, even if it has an incidental effect

on some speakers or messages but not others. Thus, a regulation that targets only potentially harmful secondary effects of speech, rather than the contents of the speech itself or the listener's agreement or disagreement with those contents, is deemed content-neutral.

Id. at 149-50 (internal quotation marks and citations omitted).

The 2003 and 2007 ordinances are content-neutral. The stated purpose of the 2003 ordinance is to "protect and preserve the health, safety and welfare of the patrons of [sexually oriented businesses], as well as the health, safety and welfare of the City's citizens . . . because such businesses may and do generate secondary effects which are detrimental to neighborhoods." § 2.3-1(1). The ordinance identifies the secondary effects associated with sexually oriented businesses as including "personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, illicit drug use and drug trafficking, negative impacts on property values, urban blight, pornographic litter, and sexual assault and exploitation." § 2.3-1(6).

Similarly, the stated purpose of the 2007 ordinance is "to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented

-15-

businesses within the City." § 2.3-1(a). The ordinance identifies such secondary effects as including "personal and property crimes, prostitution, lewdness, public indecency, unsanitary conditions, potential spread of disease, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, blight, litter, and sexual assault and exploitation." § 2.3-1(b)(1). Both ordinances include express findings and cite the evidence the Board relied upon in reaching the conclusion that sexually oriented businesses are associated with the listed adverse secondary effects. See § 2.3-1(2) and (6) (2003) and § 2.3-1(b)(1) (2007).

Because the 2003 and 2007 ordinances are not an attempt to regulate the primary effects of the expression, but rather target secondary effects of the expression, the court concludes that the ordinances are content-neutral time, place, and manner regulations, and thus subject to intermediate scrutiny. The standard for evaluating restrictions on symbolic speech such as erotic dancing is set forth in United States v. O'Brien. See Pap's A.M., 529 U.S. at 289 (citing United States v. O'Brien, 391 U.S. 367, 377 (1968)). "Under O'Brien, an ordinance is valid if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial government interest; (3) the government interest is unrelated to the suppression of

free expression; and (4) the restriction is not greater than is essential to the furtherance of the government interest." White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 169 (2d Cir. 2007).

### 1.   O'Brien's First Element

The plaintiffs appear to argue that the City lacks the power to enact the ordinances.  However, it is clearly within the government's lawful police powers to enact measures to protect public health and safety. See Pap's A.M., 529 U.S. at 296 (the city's "efforts to protect public health and safety are clearly within the city's police powers"); Barnes, 501 U.S. at 567; Conn. Gen. Stat. § 7-148(7)(A)(ii). Therefore, this element is satisfied as to both ordinances.

### 2.   O'Brien's Second Element

O'Brien also requires that an ordinance further an important or substantial government interest. See 391 U.S. at 377. The plaintiffs argue that the ordinances fail this test, or at the very least, genuine issues of material fact exist as to whether the materials relied on by the City demonstrate that this test is satisfied, thus making summary judgment in favor of the defendant inappropriate. The City argues that the ordinances are sufficiently supported by evidence in the legislative record and thus satisfy this element.

-17-

"[T]o demonstrate that an ordinance furthers a substantial government interest, a municipality must show that in enacting the legislation, it relied on some evidence 'reasonably believed to be relevant' to the problem of negative secondary effects." White River Amusement Pub, Inc., 481 F.3d at 171 (quoting City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 51 (1986)). A municipality must provide some evidence of a connection between "the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." Alameda Books, 535 U.S. at 441. However, "a city need not prove that such a link exists or prove that its ordinance will be effective in suppressing secondary effects." White River Amusement Pub, Inc., 481 F.3d at 171.

While "[t]he municipality's evidence must fairly support the municipality's rationale for its ordinance," Alameda Books, 535 U.S. at 438, this inquiry takes the form of a burden-shifting analysis.

> If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in Renton. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

Alameda Books, Inc., 535 U.S. at 438-49 (2002) (citing Pap's
A.M., 529 U.S. at 298). In commenting on the breadth of evidence
a city may consider, the Second Circuit has noted:

> Based on this standard, the Supreme Court has upheld
> ordinances where a city conducted hearings and
> reviewed a report on the experience of other cities,
> Renton, 475 U.S. at 44; expressly relied on the
> evidentiary foundation in prior judicial opinions as
> well as the city's own findings, Pap's A.M., 529 U.S.
> at 296-97; and relied on a study conducted many years
> prior to enactment of the ordinance, Alameda Books,
> 535 U.S. at 430.

White River Amusement Pub, Inc., 481 F.3d at 171 (internal
citations partially omitted).

Because the briefing on this element does not distinguish
between the 2003 and 2007 ordinance, the court assumes that the
parties' arguments apply equally to both. The legislative
history of the 2007 ordinance is slightly different from that of
the 2003 ordinance.

On June 2, 2003, the Board of Aldermen took up the issue of
amending the City's Ordinance Regulating Adult-Oriented
Establishments that was enacted in 1996. The Board placed into
the record 43 studies on the negative secondary effects of adult
businesses, but postponed the vote on the proposed amendments
until August 4, 2003, when the Board voted to amend the
ordinance.

The policy statement, set forth in § 2.3-1 of the 2003 ordinance, provides:

> This ordinance is based on evidence of the adverse secondary effects of adult uses that is within the common knowledge of municipalities and is widely reported in judicial opinions, media reports, land use studies, and crime impact reports made available to the Board of Aldermen, several of which are set forth herein. Additionally, the Board of Aldermen relies on this body of secondary effects evidence to support time, place, and manner regulations of sexually oriented businesses.

The ordinance states that in support of these findings the Board of Aldermen relied upon "findings of secondary effects" discussed in cases such as Pap's A.M., 527 U.S. 277, Alameda Books, 535 U.S. 425, Renton, 475 U.S. 41, and others. § 2.3-1(1) (2003). The ordinance further states that it "relies on reports concerning secondary effects occurring in and around sexually oriented businesses" in cities such as Phoenix, Minneapolis, and Houston. Id. Finally, the Board of Aldermen relied on the paper "Sexually Oriented Businesses: An Insider's View," and the Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Businesses. See id.

The legislative record in support of the 2007 ordinance includes but is not limited to the court opinions, reports and studies relied upon by the Board of Aldermen in support of the

2003 ordinance.[3] The additional evidence included opinions, reports, and studies supporting the conclusion that sexually oriented businesses are linked to a variety of secondary effects. The Board of Aldermen was also presented with an article authored by the plaintiffs' expert witness challenging many of the studies supporting the negative secondary effects of adult businesses presented to the City.

Prior to voting to adopt the 2007 ordinance, the Board of Aldermen viewed a PowerPoint presentation by Attorney Bergthold, outside counsel for the city, which outlined and summarized the secondary effects reports, studies, and related court opinions previously provided to the Board. The 2007 ordinance states that the Board relied on these various sources in enacting the ordinance. See § 2.3-1(b).

### a.   *Relationship of Evidence the City Relies Upon to the Secondary Effects It Identifies*

The plaintiffs argue that the City's evidence does not demonstrate that the regulations are likely to successfully ameliorate the adverse secondary effects targeted by the ordinances. Specifically, the plaintiffs attack the sufficiency of the evidence, claiming that it is "prepackaged," and that the

---

[3] Included in the legislative record is a letter from the City's attorney, dated April 20, 2007, to "All Members of the Milford Board of Aldermen", encouraging the board members to review the City's materials regarding the secondary effects associated with adult businesses prior to the public hearing on the proposed ordinance scheduled for May 7, 2007.

City "failed to undertake any attempt to determine whether the
. . . studies it relied upon were relevant to the experience of
Milford." (Pls.' Mem. Resp. Def.'s Mot. Summ. J. 24.) While "a
city must provide some evidence of a connection between the
speech regulated by the ordinance and the secondary effects that
motivated the adoption of the ordinance," a municipality "need
not prove that such a link exists or prove that its ordinance
will be effective in suppressing secondary effects." White River
Amusement Pub, Inc., 481 F.3d at 171 (citing Alameda Books, 535
U.S. at 441). "The First Amendment does not require a city,
before enacting such an ordinance, to conduct new studies or
produce evidence independent of that already generated by other
cities, so long as whatever evidence the city relies upon is
reasonably believed to be relevant to the problem the city
addresses." Renton, 475 U.S. at 51; see also Alameda Books, 535
U.S. at 439 (explicitly rejecting the suggestion that a city be
required to produce empirical data in support of the anticipated
efficacy of its regulations).

The plaintiffs also argue that because many of the
materials the City relies on in enacting the ordinances involve
municipal zoning ordinances and not licensing regulations, they
cannot be reasonably relied upon. However, the fact that
evidence is relevant to one type of issue does not, in and of

-22-

itself, mean that it cannot be highly probative of an unrelated issue. The test is the relationship of the evidence to the issue under consideration, not whether it is also related to some other issue. Here, the relationship between the evidence considered by the Board and the ordinances is one where the evidence considered supports the rationale for the ordinances. Thus, it was reasonable for the Board to rely on that evidence.

The evidence considered by the Board of Alderman included cases documenting unsanitary conditions created by illicit sexual contact between patrons and performers. See, e.g., California v. LaRue, 409 U.S. 109, 111 (1972) ("Customers were found engaging in oral copulation with women entertainers; customers engaged in public masturbation; and customers placed rolled currency either directly into the vagina of a female entertainer, or on the bar in order that she might pick it up herself."); DLS, Inc. v. City of Chattanooga, 107 F.3d 403, 411 (6th Cir. 1997) ("Furthermore, particular dances described in the record—such as one instance in which a dancer invited customers to spoon-feed themselves whipped cream off of her breasts, buttocks, and vaginal area—pose a particularly acute risk of the transmission of disease."). Also included was a report from a police department on the health conditions inside adult businesses in Tucson, Arizona, including a study of fluid

-23-

samples taken from such establishments which tested positive for semen in well over 80% of samples taken. Additionally, a 1997 report from the Houston Sexually Oriented Business Ordinance Revision Committee discussed anonymous sex through book store "glory holes" and sexual contact in VIP rooms at strip clubs. Finally, the legislative record included a report discussing sexual contact during private dance activities; that report reflected that 67% of strippers interviewed had had their genitals grabbed in the strip club, and that 78% had had men expose their penises or masturbate in front of them. Such material is relevant for a Board seeking to regulate behavior within sexually oriented businesses because of a concern about unsanitary conditions and public health risks.

Annex Books, Inc. v. City of Indianapolis, 581 F.3d 460 (7th Cir. 2009), which the plaintiffs rely on with respect to this issue, is distinguishable. In finding that the evidence relied on by the defendant in enacting its adult business ordinance was insufficient, the Seventh Circuit noted that the zoning ordinances contained in the supporting material were different in nature than the ordinance at issue, which imposed hours of operation restrictions on adult bookstores. Also, it observed that "[m]ore importantly, the studies to which the City points concern adult business that offer live sex shows, viewing

booths or both. . . . Three of the four plaintiffs in this suit, however, do not offer live entertainment." Id. at 463. In other words, the ordinances relied upon by the city in Annex Books differed not only in form, but in substance from the ordinance the city ultimately enacted. Cf. Abilene Retail #30, Inc. v. Bd. of Comm'rs., 492 F.3d 1164, 1174-77 (noting that the relied-upon evidence was insufficient because the studies "examine the secondary effects of sexually oriented businesses located in urban environments; none examine businesses situated in an entirely rural area".).

### b. The Plaintiffs' Expert on "Direct Doubt" Regarding the Ordinances

The plaintiffs argue that they have successfully "cast doubt" on the City's rationale for Chapter 2.3 through their expert evidence. Specifically, the plaintiffs produce an affidavit, reports, and a study from their expert witness attacking the methodology used in evidence relied upon by the City to support the rationale that sexually oriented businesses are linked to crime and diminished property values. However, crime and diminished property values are only two of several secondary effects the City identifies as a basis for the enactment of the ordinances. For example, in the process of adopting the 2007 ordinance, the City found that the adverse

secondary effects of adult businesses include, but are not limited to, "personal and property crimes, prostitution, lewdness, public indecency, unsanitary conditions, potential spread of disease, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, blight, litter, and sexual assault and exploitation." § 2.3-1(b)(1) (2007). Even excluding those that may fall into the categories of "crime" and "property values," the remaining secondary effects of adult businesses are by themselves substantial government interests. See Alameda Books, 535 U.S. at 435-36 (upholding a city's ordinance based on evidence of secondary effect (crime) even though the evidence of another secondary effect (diminished property values) was inconclusive); American Mini Theatres, 427 U.S. at 71 (recognizing a city's "interest in attempting to preserve the quality of urban life" is a substantial government interest); Renton, 475 U.S. at 50 (same); see also Conn. Gen. Stat. § 7-148(7)(A)(ii) (including in a municipality's powers the power to "[r]egulate the mode of using any buildings when such regulations seem expedient for the purpose of promoting the safety, health, morals and general welfare of the inhabitants of the municipality"). For example, the evidence the City relied on relating to the spread of disease and prevention of unsanitary conditions is discussed

above. With respect to these secondary effects, the plaintiffs have failed to produce any evidence that calls into dispute the City's factual findings. The only criticism the plaintiffs' expert makes of this evidence is that it is foreign and is not empirical. This alone is not sufficient to cast direct doubt on the City's rationale. Again, the City need not "conduct new studies or produce evidence independent of that already generated by other cities to demonstrate the problem of secondary effects, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." See City of Erie v. Pap's A.M., 529 U.S. at 296 (quoting Renton v. Playtime Theatres, Inc., 475 U.S. at 51-52). Equally, the Board members may consider "anecdotal evidence, statistical data, prior cases, or their common sense." Abilene Retail, 492 F.3d at 1174 (citing Alameda Books, 535 U.S. at 439-40); see also World Wide Video of Wash., Inc. v. City of Spokane, 368 F.3d 1186, 1195-96 (9th Cir. 2004) ("Anecdotal evidence and reported experience can be as telling as statistical data and can serve as a legitimate basis for finding negative secondary effects."); Daytona Grand, Inc. v. City of Daytona Beach, Fla., 490 F.3d 860, 883 (11th Cir. 2007) (noting that the City's "anecdotal" evidence may be a more accurate assessment of "victimless crimes" - crimes in which all of those

involved are willing participants - than empirical data, which
often does not account for such crimes); Imaginary Images, Inc.
v. Evans, 612 F.3d 736, 741 (4th Cir. 2010) (noting the city
"may demonstrate the efficacy of its method of reducing
secondary effects by appeal to common sense, rather than
empirical data."). Thus, the court concludes that the plaintiffs
have failed to demonstrate that the City's evidence does not
support its rationale.[4] As the City's rationale that sexually
oriented businesses are linked to unsanitary conditions or
potential spread of disease is fairly supported by evidence, and
as the plaintiffs have failed to cast direct doubt on this
rationale, either by demonstrating that the City's evidence does
not support its rationale or by furnishing evidence that
disputes the City's factual findings, the court concludes the
City has met the standard set forth in Renton, and that the
ordinances further the important or substantial government
interest in maintaining the public health.

> ### 3.  O'Brien's Third Element

The third element of the O'Brien test is that the
government's interest must be unrelated to the suppression of

---

[4] The plaintiffs also argue that Lipton's deposition answers are
evidence that the regulations do not further any important or
substantial government interest, under the second prong of the O'Brien
test. However, Lipton's deposition testimony, which is discussed
below, does not show that the evidence considered by the City does not
support its rationale nor does it constitute evidence that disputes
the City's factual findings.

free expression. The City's goal of furthering the important or substantial government interest in maintaining the public health by addressing unsanitary conditions and public health risks is unrelated to the suppression of free expression. Thus, this element is satisfied.

### 4.   O'Brien's Fourth Element

Finally, O'Brien requires that the restriction on protected expression must not be "greater than is essential to the furtherance of the government interest." 391 U.S. at 377. While the Supreme Court has used slightly different formulations to express this requirement since O'Brien, it has settled on the formulation that the regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests." See Universal City Studios, Inc. v. Corley, 273 F.3d 429, 450 n.25 (2d Cir. 2001).

The plaintiffs argue that the ordinances fail this standard in two ways. First, the plaintiffs argue that a pasties and g-string requirement is the maximum restriction on live dance entertainment that can satisfy O'Brien's narrow tailoring requirement, and that as a result, any further regulation of the conduct itself, such as the buffer zone restriction, see § 2.3-3(7)(B) (2003) and § 2-3-17(b) (2007), and the prohibitions on direct touching and tipping, see § 2.3-3(7)(C-D) (2003) and

§ 2.3-17(c), is an impermissible restriction on expressive conduct. Second, the plaintiffs argue that the economic impact of the buffer zone, "no touching"/"no tipping", and the interior configuration requirements reduce the quantity and accessibility of protected expression to an impermissible degree.

### a.   Regulations on Conduct

The plaintiffs' assertion that the maximum restriction on live dance entertainment permissible pursuant to O'Brien's balancing test is pasties and a g-string is unpersuasive. The plaintiffs rely on Barnes v. Glen Theatre, Inc. and City of Erie v. Pap's A.M. While in both cases the Supreme Court indicated that a pasties and g-string limitation is a minimal restriction on nude dancing, neither case is properly read to suggest that this limitation is the most intrusive limitation that may be constitutionally imposed. See Barnes v. Glen Theatre, Inc., 501 U.S. at 572 (concluding that where the state's substantial interest was in protecting order and morality by prohibiting public nudity, the requirement the dancers "wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose"); City of Erie v. Pap's A.M., 529 U.S. at 301 ("The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the

asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message.") (emphasis added); see also Richland Bookmart, Inc. v. Knox County, Tenn., 555 F.3d 512, 529-30 (6th Cir. 2009) (noting that neither Barnes and Pap's A.M. "may be read to suggest . . . that pasties and g-strings are the most intrusive requirement that may be constitutionally imposed"); Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 299 (6th Cir. 2008) (upholding a prohibition on total nudity, the requirement that semi-nude performers maintain a six-foot distance from patrons on a stage at least eighteen inches from the floor and a no-touching rule between performers and audience members and holding that without further support, the argument that "the sum of the Ordinance's parts placed such a significant burden on speech as to violate the First Amendment, even though each individual provision is constitutional... is unavailing.").[5]

### b. *Economic Impact*

The plaintiffs argue that the buffer zone, "no touching"/"no tipping", and interior configuration requirements will impermissibly reduce the quantity and accessibility of protected expression.

---

[5] The court has considered G.M. Enterprises, Inc. v. Town of St. Joseph, 350 F.3d 631 (7th Cir. 2003) and R.V.S. v. City of Rockford, 361 F.3d 402 (7th Cir. 2004), which were cited by the plaintiffs, and concludes that they are not on point.

The plaintiffs assert that the City has the burden of demonstrating that the ordinances can appropriately ameliorate identified secondary effects "without impairing the quantity and accessibility of speech." (Pls.' Resp. Def.'s Mot. Summ. J. 42.) However, O'Brien and its progeny do not require the City to carry that burden, and the plaintiffs' reliance on Justice Kennedy's concurrence in Alameda Books for support for this proposition is unpersuasive.

> [A] narrowly tailored time, place, or manner regulation need not be the least intrusive means to achieve the government's interest. The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation, although the government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.

Centerfolds, Inc. v. Town of Berlin, 352 F. Supp. 2d 183, 191 (D. Conn. 2004) (citing Ward, 491 U.S. at 299). Furthermore, the court does not agree with the plaintiffs that Justice Kennedy's concurrence in Alameda Books "truly operationalizes" the fourth prong of O'Brien. (Pls.' Resp. Def.'s Mot. Summ. J. 44.) Rather, Justice Kennedy was elaborating on Renton, not O'Brien. See 535 U.S. 425, 444-45. It is within the context of identifying "the claim a city must make in order to justify a content-based zoning ordinance" that Justice Kennedy stated that "[t]he

-32-

rationale for the ordinance must be that it will suppress secondary effects—and not by suppressing speech." Id. at 449-50. The concurrence stops short of referring to, let alone "operationalizing," the standard that is to be applied with respect to O'Brien's fourth element.

The plaintiffs also argue that the effect on protected speech of the ordinances is "catastrophic" not only because the ordinance will require Keepers and After Dark to incur renovation costs, but also because the 2007 ordinance will make the businesses less profitable by limiting the amount of entertainment available. (Pls.' Resp. Def.'s Mot. Summ. J. 44.) In support of this argument, the plaintiffs produce diagrams of the two businesses with accompanying affidavits detailing the impossibility of compliance with the ordinance given the businesses' current layouts. However, this evidence falls short of a showing that the ordinance "burden[s] substantially more speech than is necessary to further the government's legitimate interests." See Universal City Studios, Inc. v. Corley, 273 F.3d 429, 450 n.25 (2d Cir. 2001). The plaintiffs have merely shown that the interior of their establishments as configured currently are not amenable to compliance with the ordinance. It is not the case that the City, in order to craft a narrowly tailored ordinance, must take into account the interior

-33-

configurations of all of the then-existing adult businesses prospectively subject to its regulations. Finally, the plaintiffs' argument that economic impact must be considered in First Amendment analysis is addressed, and rejected, in Section III.G.4.a, infra.

The court finds that both the 2003 ordinance and the 2007 ordinance satisfy all four elements established in O'Brien. Therefore, the ordinances are valid restrictions on speech, and the plaintiffs' motion for summary judgment on their First Amendment claim based on undue burden on protected expression is being denied and the defendant's motion for summary judgment on the First Amendment claim based on undue burden on protected expression is being granted.

### C.   Fourteenth Amendment – Vagueness

The plaintiffs claim that the 2003 and 2007 ordinances are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment. The defendant contends that the plaintiffs lack standing to bring such a claim, that the ordinances' scienter requirements defeat any vagueness claim, and that, in any event, the ordinances are not vague.

"As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of

ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 186 (2d Cir. 2010). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Id. at 186-87 (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)). As the Supreme Court has explained:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

"In reviewing an ordinance's language for vagueness, 'we are relegated . . . to the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.'" VIP of Berlin, 593 F.3d at 187 (quoting Grayned, 408 U.S. at 110). However, "although the [official charged with enforcing the ordinance's]

understanding of the ordinance's terms is relevant 'perhaps to some degree,' our inquiry begins with the text of the ordinance." Id. (internal citation omitted). An ordinance may be challenged on the ground that it is impermissibly vague "as applied" to the plaintiffs and/or on the ground that it is impermissibly vague "on its face."[6]

### 1.   As-Applied Vagueness Claim

In their Reply in Support of Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 86), the plaintiffs dispute that they are mounting solely a facial challenge to § 2.3 and assert that they also challenge the ordinances as applied to them.[7] The defendant has not responded to this contention as the plaintiffs make this claim for the first time in their reply brief. In any event, the court finds that the plaintiffs lack standing to bring an as-applied challenge.

---

[6] The court usually considers "as applied" challenges first: "Because the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied to the plaintiff, '[a] court should ... examine the complainant's conduct before analyzing other hypothetical applications of the law.'" Farrell v. Burke, 449 F.3d 470, 485 (2d Cir. 2006) (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 495, (1982)).

[7] The plaintiffs claim that the statute has been "applied" to them because they have been subjected to licensing fees under the 2003 ordinance and that, although neither the 2003 or 2007 ordinances have been enforced, the City has determined that the plaintiffs operate an "adult-oriented business" within the definition of the ordinances. The plaintiffs further contend that their proposed future conduct (which is not specified) make them eligible to challenge the conduct as applied. The court notes, however, that the sole relief the plaintiffs have requested in their briefing on the issue of vagueness is that the statute be invalidated in its entirety because its defects are non-severable: a remedy exclusive to facial challenges.

It is well-established that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." Parker v. Levy, 417 U.S. 733, 756 (1974). While Parker v. Levy was decided in the criminal law context, this principle equally applies to regulations affecting adult-oriented businesses. See Young v. American Mini Theaters, Inv., 427 U.S. 50, 58-59 (1976) ("For even if there may be some uncertainty about the effect of the ordinances on other litigants, they are unquestionably applicable to these respondents . . . . To the extent that their challenge is predicated on inadequate notice resulting in a denial of procedural due process under the Fourteenth Amendment, it must be rejected."); Gold Diggers, LLC v. Town of Berlin, Conn, 469 F. Supp. 2d 43, 54 (D. Conn. 2007) (finding no standing and noting that "it appears that plaintiffs intend to operate [adult-oriented businesses] and that the ordinance unquestionably applies to them").

The plaintiffs state that they are a "cabaret-style nightclub" that "features live, non-obscene, clothed and semi-nude ("topless") performance dance entertainment presented to the consenting adult public." (Compl. ¶ 12). They intend to operate and continue to operate a business such that the ordinance is "unquestionably applicable" to them and that "any

element of vagueness" as to the terms defining businesses to be regulated "has not affected [the plaintiffs]." See Gold Diggers, 469 F. Supp. 2d at 54. Thus, the plaintiffs cannot establish standing to bring an "as applied" due process vagueness claim.

A statute may also be vague as-applied if it "authorizes or even encourages arbitrary and discriminatory enforcement." VIP of Berlin, 593 F.3d at 186. The plaintiffs have made no claim that the ordinance has been or will be arbitrarily or discriminatorily enforced against Keepers.[8] See United States v. Lambert, 446 F. Supp. 890, 896 (D. Conn. 1978) (rejecting plaintiff's as-applied vagueness challenge because "the present case is not an example of the government's unfettered discretion"). The plaintiffs' as-applied challenge thus fails.

## 2.   Facial Vagueness Claims

"Federal courts as a general rule allow litigants to assert only their own legal rights and interests, and not the legal rights and interests of third parties." Farrell v. Burke, 449 F.3d 470, 494 (2d Cir. 2006); see also Broadrick v. Oklahoma,

---

[8] While the plaintiffs argue that Lipton's deposition testimony establishes that the enforcement provisions of the statute are vague, they base this argument on Lipton's answers to hypothetical situations with which she was presented; her deposition testimony is discussed below. But in an as-applied challenge, "a court's analysis should be confined to the litigant's actual conduct, and a court should not analyze whether a reasonable person would understand that certain hypothetical conduct or situations violate the statute." VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 189 (2d Cir. 2010) (emphasis in original) (citing Perez v. Hoblock, 368 F.3d 166, 175 (2d Cir. 2004)).

413 U.S. 600, 610 (1973 ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others."). However, "the limitations on third-party standing that restrict such challenges are prudential, not jurisdictional." Dickerson v. Napolitano, 604 F.3d 732, 742 (2d Cir. 2010). Courts have recognized exceptions to this requirement. One such exception "has been carved out in the area of the First Amendment." Id. at 611. See also Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S 787, 798-99 (1984) (recognizing the overbreadth doctrine in First Amendment jurisprudence as an exception from "the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court"); Lambert, 466 F. Supp. at 896 (same). Thus, "[t]he general rule disfavoring facial vagueness challenges does not apply in the First Amendment context." Farrell, 449 F.3d at 496.

This limited exception reflects the "weighty countervailing policies" behind protecting First Amendment rights. Broadrick, 413 U.S. at 611 (citing United States v.

Raines, 362 U.S. 17, 22-23 (1960)). As explained in Young v.

American Mini Theaters, Inc.,

> a defendant whose own speech [is] unprotected [has]
> standing to challenge the constitutionality of a
> statute which purported to prohibit protected speech,
> or even speech arguably protected. This exception from
> traditional rules of standing to raise constitutional
> issues has reflected the Court's judgment that the
> very existence of some statutes may cause persons not
> before the Court to refrain from engaging in
> constitutionally protected speech or expression.

427 U.S. 50, 59-60 (1976) (citing Broadrick, 413 U.S. at 611-

614). The danger that statutes may infringe upon the fundamental

speech rights of persons not before the court has led First

Amendment jurisprudence to

> recognize a different approach where the statute at
> issue purports to regulate or proscribe rights of
> speech or press protected by the First Amendment.
> Although a statute may be neither vague, overbroad, or
> otherwise invalid as applied to the conduct charged
> against a particular defendant, he is permitted to
> raise its vagueness or unconstitutional overbreadth as
> applied to others. And if the law is found deficient
> in one of these respects, it may not be applied to him
> either, until and unless a satisfactory limiting
> construction is placed on the statute.

Coates v. City of Cincinnati, 402 U.S. 611, 619-20 (1971)

(internal citations omitted); see also United States v.

Williams, 553 U.S. 285, 304-06 (2008) ("Although ordinarily [a]

plaintiff who engages in some conduct that is clearly proscribed

cannot complain of the vagueness of the law as applied to the

conduct of others, we have relaxed that requirement in the First

Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech" (internal quotation marks omitted).) Thus, "[a] defendant whose conduct is at the 'core' of the activities clearly covered by the statute's terms may only raise a vagueness defense if the statute is one that is likely to chill the exercise of constitutionally protected conduct." United States v. Loy, 237 F.3d 251, 259 (2d Cir. 2001); see also Young, 427 U.S. at 60 ("[I]f a statute's deterrent effect on legitimate expression is both real and substantial, and if the statute is readily subject to a narrowing construction by the state courts, the litigant is not permitted to assert the rights of third parties.") (internal quotation marks and citations omitted).[9] Here, the plaintiffs may assert a facial vagueness challenge to the ordinances.

---

[9] It remains somewhat unsettled whether the requirements that the ordinance have a "real and substantial" deterrent effect on speech and not be "readily subject to a limiting interpretation" is truly a threshold "standing requirement" or is more readily understood as the requirement to mount a successful claim of facial vagueness. As the court in Lambert observed:

> In Young, the Supreme Court referred to these criteria as a test of standing. But the test does not prevent a party from raising the First Amendment claims and it does not relieve a court from considering them. However, once the claims of third parties have been raised, the test places a heavy burden on the party seeking invalidation of the statute to show that the statute deserves to be declared void on its face. The test thus concerns the requirement for successfully asserting the right of third parties. Otherwise the distinction between standing and success on the merits would be lost.

To be constitutional, a law must "give the person of
ordinary intelligence a reasonable opportunity to know what is
prohibited so that he may act accordingly." Grayned, 408 U.S. at
108. "Vagueness in the law is particularly troubling when First
Amendment rights are involved", and as a result, "[w]here a
statute's literal scope, unaided by a narrowing state court
interpretation, is capable of reaching expression sheltered by
the First Amendment, the doctrine demands a greater degree of
specificity than in other contexts." Farrell, 449 F.3d at 485
(quoting Smith v. Goguen, 415 U.S. 566, 573 (1974)). However, as
Court observed in Young, that requirement of a greater degree of
specificity required for statutes which infringe on First
Amendment rights is relaxed somewhat in the context of adult

---

446 F. Supp. at 897 n.8 (emphasis in original; internal citations
omitted).
     This analysis is bolstered by the fact that Young cites Erznoznik
v. City of Jacksonville, 422 U.S. 205 (1975) for the "real and
substantial" and "limiting interpretation" requirements for
"standing". See id. at 216. Erznoznik states, "a state statute should
not be deemed facially invalid unless it is not readily subject to a
narrowing construction by the state courts, and its deterrent effect
on legitimate expression is both real and substantial." Id. (internal
citations omitted). Thus, Erznoznik's standard is a standard governing
whether courts should declare a statute facially invalid, i.e., a
standard governing analysis on the merits, not a standard regarding
standing. See also Gold Diggers, 469 F. Supp. 2d at 54 ("Plaintiffs'
vagueness challenge may also be construed as asserting overbreadth or
that the ordinance's flawed language compromises First Amendment
protected speech of third parties not before the court. On such a
challenge the Court must consider whether such effect is both real and
substantial and whether the Ordinance is not readily susceptible to a
limiting construction. Thus, the Court must look to the merits of
plaintiffs' arguments to determine the Ordinance's deterrent effect on
the protected speech of third parties.") (internal citations omitted).

entertainment. See 427 U.S. at 61. In rejecting a vagueness challenge for a zoning ordinance affecting sexually-oriented businesses, the Court stated:

> [t]he fact that the First Amendment protects some, though not necessarily all, of [pornographic material] from total suppression does not warrant the further conclusion that an exhibitor's doubts as to whether a borderline film may be shown in his theater . . . involves the kind of threat to the free market in ideas and expression that justifies the exceptional approach to constitutional adjudication recognized in [other First Amendment cases].

Id.

### a. 2003 Ordinance

Keepers challenges the 2003 ordinance contending that the terms "adult cabaret" and "any commercial establishment that regularly features adult entertainment" are unconstitutionally vague. The plaintiffs also assert that the challenge to the use of the term "regularly features" applies with equal force to the 2007 ordinance. The plaintiffs argue that the terms are impermissibly vague because (a) "they define for regulation that which is also prohibited by the ordinance," and (b) the terms are defined using the words "regularly features," which "contains no specific standards." (Pls.' Mem. Supp. Mot. Summ. J. 6, 8.) Finally, the plaintiffs argue that the licensing scheme which governs Chapter 2.3 is unconstitutionally vague.

i.    **"They Define for Regulation That Which Is also Prohibited by the Ordinance"**

Keepers argues that the type of entertainment regulated by the 2003 ordinance is later banned by the ordinance pursuant to the ordinance's definition of "nudity or a state of nudity". Keepers contends that this contradiction renders the ordinance impermissibly vague. However, the court concludes, for substantially the reasons set forth in the defendant's brief, that Keepers has misread the ordinance and that no such conflict exists. (See Def.'s Resp. Pls.' Mot. Summ. J. 6-8.) The ordinance defines the establishments it seeks to regulate (adult cabarets and commercial establishments that regularly feature adult entertainment) as establishments regularly featuring conduct "characterized by an emphasis on any specified anatomical areas", and then prohibits conduct relating to a subset of "specified anatomical areas". See § 2.3-2(4)[10]; § 2.3-2[11]; § 2.3-2(18)[12]; § 2.3-2(13)[13] (2003). Thus, "specified

---

[10] "Adult Cabaret means... [an] establishment which regularly features live conduct characterized by an emphasis on any specified anatomical areas, as defined herein."

[11] "Any commercial establishment that regularly features adult entertainment" means, pursuant to the definition of "adult entertainment" in chapter 2.3-2, any commercial establishment that regularly features "exhibition of motion pictures, displays, or live performances which are characterized by an emphasis on... 'specified anatomical areas' as defined herein."

[12] "Specified anatomical areas" means "(A) Less than completely and opaquely covered: i. human genitals, pubic region; ii. buttocks; iii. female breasts below a point immediately above the top of the areola; and (B) Human male genitals in a discernibly turgid state, even if completely opaquely covered."

-44-

anatomical areas" that are <u>not</u> prohibited include the "less than completely and opaquely covered... ii. buttocks" and "iii. female breasts below a point immediately above the top of the areola" excluding the areola and nipple. Thus, dancers can wear clothing that exposes these "specified anatomical areas" – e.g. pasties and a g-string.

### ii.   "Regularly Features"

The plaintiffs argue that the terms "adult cabaret" and "any commercial establishment that regularly features adult entertainment" are impermissibly vague because a component of the terms, "regularly features" lacks standards critical to determining whether an establishment operates as an adult-oriented business per the ordinances.

> Where 'the only vagueness in the ordinances relates to the amount of sexually explicit activity that may be portrayed before the material can be said to' fall within the scope of the ordinances, the Supreme Court has expressed skepticism about whether such ordinances have a 'significant deterrent effect on . . . First Amendment' rights.

<u>VIP of Berlin, LLC v. Town of Berlin</u>, 593 F.3d 179, 186 n.5 (2d Cir. 2010) (quoting <u>Young v. Am. Mini Theatres, Inc</u>., 427 U.S.

---

[13] "Nudity or a State of Nudity" is defined as "the showing of the human male or female genitals, pubic area, vulva, anus, anal cleft or cleavage with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple or areola."

50, 60–61 (1976) (rejecting a facial vagueness challenge to a

zoning ordinance's regulation of adult theaters)).[14]

Section 2.3-2(4) defines "regularly features" as "a

consistent course of conduct, such that the films or

performances exhibited constitute a substantial portion of the

films or performances offered as a part of the on-going business

of the sexually oriented business." § 2.3-2(4) (2003).[15]

To the extent that "regularly features" relies on the term

"substantial portion," the court concludes that the term

"substantial portion" is not vague. See VIP of Berlin, 593 F.3d

at 188, 190 n.9 (noting that the legislature has used the phrase

"substantial portion" to organize our society in a wide variety

of contexts); see also Gold Diggers, 459 F. Supp. 2d at 61 ("The

Court need not further belabor the analysis as to the vagueness

of 'substantial portion,' but joins the chorus of precedent

holding that this language provides the necessary guidance to

---

[14] The court in VIP of Berlin went on to note that:
    [B]ecause the only vagueness challenge here relates to the
    ordinance's definition of how much 'adult' merchandise
    makes a store 'adult oriented,' the degree of vagueness
    tolerated in this situation, although slightly unclear from
    existing case law, may be somewhat greater than if the
    ordinance regulated other types of more protected speech.
    Nevertheless, even if the expression at issue here were
    entitled to full First Amendment protection, the present
    ordinance's language is sufficiently specific to withstand
    VIP's as-applied vagueness challenge.
VIP of Berlin, 593 F.3d at 186 n.5.
[15] For purposes of the definition of "adult bookstore, adult novelty
store, or adult video store", the term "significant or substantial
portion" means "thirty (30%) percent or more of the term modified by
such phrase." § 2.3-2(3).

enable individuals of ordinary intelligence to understand which businesses fall within the regulation's rubric."); Ill. One News, Inc. v. City of Marshall, 477 F.3d 461, 465 (7th Cir. 2007) (finding that the definition of "adult bookstore" as "[a]n establishment having a substantial or significant portion of its stock in trade" in adult merchandise was not facially vague and noting that "[i]t is all but impossible to write a law or regulation without some qualitative words such as 'substantial'"); Doctor John's, Inc. v. City of Roy, 465 F.3d 1150, 1157, 1160 (10th Cir. 2006) (noting that to prevail on a facial vagueness challenge, a party "must show, at a minimum, that the challenged law would be vague in the vast majority of its applications" and that the phrase "'significant or substantial' portion of its wares devoted to adult material survives Dr. John's facial vagueness challenge"); ILQ Invs., Inc. v. City of Rochester, 25 F.3d 1413, 1419 (8th Cir. 1994); 511 Detroit St., Inc. v. Kelley, 807 F.2d 1293, 1295-97 (6th Cir. 1986); Mom N Pops, Inc. v. City of Charlotte, 979 F. Supp. 372, 393-94 (W.D.N.C. 1997); 15192 Thirteen Mile Rd., Inc., v. City of Warren, 626 F. Supp. 803, 819-21 (E.D. Mich. 1985); City of Chi. v. Scandia Books, Inc., 430 N.E.2d 14, 18 (Ill. App. Ct. 1981) ("The word 'substantial' as used in the definition of adult bookstores is not so indefinite as to render the ordinance

void and unenforceable."); Dandy Co., v. Civil City of South
Bend, County-City Complex, 401 N.E.2d 1380, 1386 (Ind. Ct.
App.1980) ("The definition[s] of [substantial or significant]
must necessarily be determined on a case-by-case basis and are
therefore not capable of precise mathematical calculation.").

### iii. Ambiguity in Licensing

Keepers attacks the licensing scheme laid out in the 2003
ordinance as ambiguous and therefore unconstitutionally vague.
Keepers argues that the 2003 ordinance requires an "operator" of
an adult-oriented establishment, defined as: "any person, or any
proprietor, shareholder, general partner or limited partner who
participates in the management or day-to-day operations and/or
control of the establishment", to apply for a license under the
ordinance. In turn, the term "applicant" includes "operators, as
defined in 2.3-2(14) and any other persons directly involved in
the management or control of the adult-oriented establishment."
(Pls.' Mem. Supp. Mot. Summ. J. 10.) Finally, Keepers challenges
as vague the ordinance's definition of the applicants who must
file when the adult-oriented establishment is an "enterprise,"
as the ordinance requires the applicant to provide background
information as to several enumerated parties as well as "all
other persons with authority to participate directly and
regularly in management and/or operation of the business." (Id.)

Keepers claims that these definitions are conflicting, but it does not explain how or why they are. At worst, the definitions of "operator," which includes "any person . . . who participates in the management . . . and/or control of the establishment," and "applicant" which includes both "operators" and "any other persons . . . involved in the management or control of the . . . establishment" are redundant, not conflicting. Thus, the court finds that these terms are not vague.

Keepers also contends that the term "enterprise" is vague. The plaintiff argues: "if the applicant is an 'enterprise' (whatever that may mean—the term is not defined anywhere in the Ordinance), it shall designate an officer or partner as an 'applicant.'" (Id.) Webster's Dictionary defines "enterprise" as "a unit of economic organization or activity; esp: a business organization." Webster's New Collegiate Dictionary (1981). Nor does the plaintiff suggest that "enterprise" is used in such a way as to suggest a meaning different from this generally understood definition. Thus, the court finds the term "enterprise" is not vague.

The alleged vagueness in the 2003 ordinance is unlikely to chill constitutionally protected conduct as it gives sufficient notice as to what is prohibited. Thus, the 2003 ordinance is not unconstitutionally vague, and the foregoing analysis applies to

the comparable sections of the 2007 ordinance as to which the
plaintiffs advance the same arguments.

### b. The 2007 Ordinance

The plaintiffs produce the deposition testimony of Marilyn
Lipton, former attorney for the City of Milford, to support an
argument that the ordinance not only includes additional vague
terms, but also does not give sufficient guidance as to how it
is to be enforced. In response, the defendant submits an
affidavit and memorandum by Chief of Police Keith Mello to
supplement Lipton's deposition testimony. The court considers
both in assessing whether the 2007 ordinance is impermissibly
vague.[16]

---

[16] Mello's Memorandum and Affidavit was the subject of a motion to
strike by the plaintiffs, who claimed that "[t]he Affidavit and
Memorandum are improper under Rule 56(e) and otherwise because they
conflict with the previous binding testimony of (former) city attorney
Marilyn Lipton on behalf of the city regarding the interpretation and
enforcement of Chapter 2.3." (Pls.' Mot. Strike ¶ 2 (Doc. No. 71).)
The defendant responded that the plaintiffs never disclosed to either
them or Lipton which sections of the ordinance were allegedly vague,
leaving Lipton unable to properly prepare for the plaintiffs'
questions at her deposition, and that Lipton's responses of "I don't
know" to certain hypothetical questions offered by the plaintiff were
not contradicted by Mello's memorandum, only supplemented by it. (See
Def.'s Mem. Opp. Pls.' Mot. Strike 4 (Doc. No. 75).) In the Order Re
Plaintiff's Motion to Strike Affidavit, Etc., the court denied the
motion to strike, noting that neither party, either in the complaint
or during the discovery process, endeavored to identify which portions
of the ordinance were allegedly vague. The court concluded that now,
after both the plaintiffs' and defendant's submissions, "there are
specific contentions as to the ordinance being vague, and those
specific contentions have been responded to. . . . Therefore, the
court will consider the defendant's submission, keeping in mind the
circumstances under which it came to be prepared." (Order Re Pls.'
Mot. Strike 1 (Doc. No. 79).)

### i. Whether the 2007 Ordinance Provides Adequate Standards to Guide Law Enforcement

"The more important part of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." Kolender v. Lawson, 461 U.S. 352, 358 (1983). "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned, 408 U.S. at 108. A statute is unconstitutionally vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." VIP of Berlin, 593 F.3d at 186. It is a "well-established principle that statutes will be interpreted to avoid constitutional difficulties." Frisby v. Schultz, 487 U.S. 474, 483 (1988) (citing Erznoznick, 422 U.S. at 216; Broadrick, 413 U.S. at 613).

The plaintiffs rely on Lipton's responses to various questions posed to her at a 30(b)(6) deposition in support of their argument that the 2007 ordinance fails to provide law enforcement officials with "explicit standards" for enforcement. Grayned, 408 U.S. at 108. Specifically, they point to 33 instances in Lipton's deposition where she was unable to provide

-51-

definitive answers to the plaintiffs' questions about how the ordinance was to be applied in certain scenarios. The plaintiffs rely heavily on VIP of Berlin, LLC v. Town of Berlin, where the court held that a zoning ordinance regulating adult-oriented bookstores was unconstitutionally vague in its use of the term "substantial or significant portion." 664 F. Supp. 2d 151 (D. Conn. 2009). A key aspect of the court's analysis in VIP of Berlin was its determination that the officers who testified at the motion hearing gave inconsistent definitions of the term, amounting to what the court termed an "I know it when I see it" enforcement standard. Id. at 165. The plaintiff argues that this ruling, and the case it "drew heavily" from, City of Knoxville v. Entertainment Resources, LLC, 166 S.W.3d 650 (Tenn. 2005), is instructive because Lipton was similarly unable give a consistent definition of the terms in the ordinance. (See Pls.' mem. Supp. Mot. Summ. J. 20.)

On appeal, however, the Second Circuit noted that "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." VIP of Berlin, 593 F.3d at 187. The Second Circuit used common dictionary definitions to conclude that the terms "substantial" and "significant" were not vague in the context of the zoning ordinance. While the court

acknowledged that "[i]n addition to a statute's plain meaning
and stated purpose, courts should determine whether a statute
provides sufficiently clear enforcement standards by analyzing
'perhaps to some degree . . . the interpretation of the statute
given by those charged with enforcing it,'" id. at 187 (citing
Grayned, 408 U.S. at 110), it ultimately found that the
testimony given was consistent with the zoning ordinance's
stated purpose and plain meaning. See id. In Grayned, in the
absence of a state judicial interpretation of a questioned
ordinance, the Court recognized that it was "relegated to the
words of the ordinance itself, to the interpretations the court
below has given to analogous statutes, and, perhaps to some
degree, to the interpretation of the statute given by those
charged with enforcing it." 408 U.S. at 110.

    The court finds that the ordinance here is clear on its
face, as Grayned requires. The court also finds that "the
interpretation of the statute given by those charged with
enforcing it," 408 U.S. at 110, is consistent with the plain
meaning of the ordinance itself.

     Lipton's 30(b)(6) testimony on behalf of the City is
offered by the plaintiffs not to show the City's official
position on the ordinance, but instead to suggest a lack
thereof. The plaintiffs argue that Lipton "had little to no

understanding as to how the words, phrases, and provisions
contained within the ordinance are to be applied and/or
enforced, and further testified that no policies whatsoever have
been adopted by Milford." (See Pls.' Mem. Supp. Mot. Summ. J.
11.) The plaintiffs take issue with the circumstances under
which the Mello Affidavit and Memorandum (submitted with the
defendant's response) was prepared, voicing concern that it was
prepared on the eve of the defendant's deadline for responding
to their summary judgment motion. They note that "Courts have
been skeptical of directives issued by government officials
after the commencement of litigation in an apparent attempt to
demonstrate a 'well established' practice." Bella Vista United
v. City of Philadelphia, Civ. No. A. 04-1014, 2004 WL 825311 at
*5 (E.D. Pa. April 15, 2004).

However, the Mello Affidavit and Memorandum makes no such
attempt. Rather than interpreting the ordinance's terms and
procedures, Mello identifies the sections of the ordinance which
clearly govern these issues; little to no policy or textual
interpretation is provided. Insofar as the Mello Affidavit and
Memorandum interprets the ordinance in order to respond to the
plaintiffs' questions, these interpretations are (a) based on a

"plain meaning" understanding of the terms of the ordinance,[17] or (b) consistent with the ordinance's stated purpose.[18]

It would be unfair to ignore this document in favor of a deposition in which the plaintiffs succeeded in surprising a deponent not charged with enforcement of the ordinace with hypotheticals that served to "stump" her. While "there is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question," American Communications Assn. v. Douds, 339 U.S. 382, 412 (1950), "speculation about possible vagueness in hypothetical situations not before the [c]ourt will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." Hill v. Colorado, 530 U.S. 703, 733 (2000) (citing United States v. Raines, 362 U.S. 17, 23 (1960)).

### ii. Scienter Requirement

The defendant argues that the scienter element in the ordinance "will prevent a finding of unconstitutionality." (Def.'s Mem. Supp. Mot. Summ. J. 62 (citing Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 324 (1952).)

The Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with

---

[17] (See Mello Mem. ¶¶ 1, 5, 14, 18, 22, 23.)
[18] (See Mello Mem. ¶¶ 13, 16, 20, 21.)

respect to the adequacy of notice to the complainant that
conduct is proscribed." Hoffman Estates, 455 U.S. at 499.
However, the presence of a scienter requirement is not
dispositive. In Hill v. Colorado, the Supreme Court considered a
statute aimed at preventing protestors at abortion clinics from
engaging in "sidewalk counseling." 530 U.S. 703 (2000). The
statute made it unlawful for a person to, within 100 feet of the
entrance to a health care facility, "knowingly approach"
entrants to the facility for the purpose of passing out
leaflets, giving counseling, orally protesting, or engaging in
various other similar activities. Id. at 707. With respect to
the requirement that one must "knowingly approach" another
person, the court rejected a vagueness challenge, noting that
"the likelihood that anyone would not understand any of those
common words seems quite remote." Id. at 732. However, as to
another aspect of the statute, the eight-foot no-approach zone,
the Court found that a "citizen may walk from a disfavored-
speech zone to a free zone with little or no ability to discern
when one ends and the other begins. . . . Scienter cannot save
so vague a statute as this." Id. at 774.

Here, the ordinance provides: "It is unlawful for a
sexually oriented business operator to knowingly violate the
following regulations or to knowingly allow an employee or any

other person to violate the following regulations." § 2.3-17
(2007). The regulations that follow prohibit anyone on the
premises from appearing in a state of nudity, semi-nude
performers from violating the six-foot buffer requirement,
performers from touching patrons, and minors from entering the
premises. The court finds that the plain meaning of these
provisions is clear, and insofar as there remains any danger of
notice to potential violators, it is mitigated by the scienter
requirement. The likelihood that anyone subject to these
provisions would not understand these terms seems remote. To the
extent that the six-foot buffer zone resembles the eight-foot
buffer zone at issue in Hill, the buffer zone in the present
ordinance is not only fixed, but elevated, and the requirement
applies only to performers. See § 2.3-17(b) (2007).

Thus, the court concludes that the 2007 ordinance is not
unconstitutionally vague on its face. It does not authorize or
encourage arbitrary or discriminatory enforcement, and insofar
as there could be a danger of notice to potential violators, it
is mitigated by a scienter requirement.

Therefore, the plaintiffs' as-applied and facial challenges
to the ordinances for vagueness both fail. The plaintiffs'
motion for summary judgment on their Fourteenth Amendment

vagueness claim is being denied, and the defendant's motion for summary judgment on that claim is being granted.

### D. **First Amendment - Overbreadth**

The Second Circuit has observed that

> [o]verbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing. A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them. All overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court.

Farrell, 449 F.3d at 499. "A plaintiff claiming overbreadth need not show that the challenged regulation injured his or her First Amendment interests in any way in order to bring the overbreadth challenge" but the plaintiff must satisfy the Article III requirement of "injury-in-fact" and is "expected satisfactorily to frame the issues in the case." Id.

"[T]he analysis of the merits of an overbreadth challenge is essentially the same as the analysis discussed above in the facial vagueness context." Id. Here, while the plaintiffs do not specifically bring an overbreadth challenge, the court interprets their vagueness claim as encompassing both First Amendment vagueness and overbreadth. Since the analysis of the

-58-

two claims is essentially the same in this context, the court's analysis above precludes a finding of overbreadth.

Therefore, the defendant's motion for summary judgment as to the plaintiffs' First Amendment overbreadth claim is being granted.

**E.   First Amendment - Prior Restraint**

The plaintiffs contend that the provisions in the 2003 and 2007 ordinances with respect to licensing, denial, nonrenewal, suspension and revocation represent prior restraints. The defendants counter that the ordinances do not impose any impermissible prior restraint.

**1.   Procedural Protections**

"Where expression is conditioned on governmental permission, such as a licensing system for movies, the First Amendment generally requires procedural protections to guard against impermissible censorship." See Freedman v. Md., 380 U.S. 51, 58 (1965). Thus, for a licensing scheme that implicates speech to pass constitutional muster:

> (1) any restraint imposed prior to judicial review must be limited to "a specified brief period"; (2) any further restraint prior to a final judicial determination must be limited to "the shortest fixed period compatible with sound judicial resolution"; and (3) the burden of going to court to suppress speech and the burden of proof in court must be placed on the government.

John Doe, Inc. v. Mukasey, 549 F.3d 861, 871 (2d Cir. 2008)

(quoting Freedman 380 U.S. at 58-59); see also FW/PBS, Inc. v.

City of Dallas, 493 U.S. 215, 227 (1990); Thomas v. Chicago Park

District, 534 U.S. 316, 321 (2002).

The plaintiffs claim the ordinances do not provide for

prompt judicial review in accordance with the third Freedman

factor. In City of Littleton v. Z.J. Gifts D-4, L.L.C., the

Supreme Court examined whether a Colorado adult business

licensing ordinance which did not explicitly provide for

judicial review provided sufficient judicial review through the

state's normal procedures to satisfy the third Freedman factor.

541 U.S. 774 (2004). In upholding the licensing scheme, the

Court noted that it "does not seek to censor material," id. at

783 (emphasis in original), but rather "applies reasonably

objective, nondiscretionary criteria unrelated to the content of

the expressive materials that an adult business may sell or

display."[19] The Court thus concluded:

> [w]here . . . the regulation simply conditions the
> operation of an adult business on compliance with
> neutral and nondiscretionary criteria and does not
> seek to censor content, and adult business is not
> entitled to an unusually speedy judicial decision . .

---

[19] The Littleton ordinance provided that "an adult business license
'shall' be denied if the applicant (1) is underage; (2) provides false
information; (3) has within the prior year had an adult business
license revoked or suspended; (4) has operated an adult business
determined to be a state law 'public nuisance' within the prior year.
. ." along with other similarly non-discretionary criteria. Littleton,
541 U.S. at 783.

. . Colorado's rules provide for a flexible system of
review in which judges can reach a decision promptly
in the ordinary case, while using their judicial power
to prevent significant harm to the First Amendment
interests where circumstances require.

Id. at 784.

While the plaintiffs concede that Littleton allows for
judicial review through the state's normal procedures when the
licensing decision is based on "reasonably objective
nondiscretionary criteria," id. at 782-83, they contend that
such a standard applies only when the state's rules for judicial
review are adequate. The plaintiffs argue that Connecticut law
is procedurally inadequate because it does not afford a right of
judicial appeal from the decision of a town council.

In Gold Diggers, the court addressed concerns identical to
the plaintiffs' concerns here. The court concluded that "[a]n
aggrieved applicant can also obtain adequate prompt judicial
review through state or federal judicial review procedures by
filing an application for a writ of mandamus or temporary
injunction in superior court or, if appropriate, an action for
injunctive or declaratory relief pursuant to § 1983." 469 F.
Supp. 2d at 57; see also Littleton, 541 U.S. at 774 (noting that
if the state's judicial review process were inadequate, "federal
remedies would provide an additional safety valve"). The court
finds the reasoning in Gold Diggers persuasive.

-61-

Thus, the plaintiffs' argument that the ordinances do not include sufficient procedural protections is unpersuasive.

### 2.   Renewal and Revocation Requirements

The plaintiffs argue that allegedly draconian suspension and revocation provisions of the 2003 and 2007 ordinances amount to a prior restraint on speech insofar as they are (a) impermissibly harsh, and (b) restrict future speech as punishment for past speech.

As to the first point, the plaintiffs claim that the suspension and other penalty mechanisms of the ordinance are unduly harsh. However, the dangers of prior restraint are "impermissible censorship" caused when a determining body has "overly broad licensing discretion." See Freedman, 380 U.S. at 56. In Gold Diggers, the court was presented with an identical argument and interpreted the argument as a challenge under O'Brien. 469 F. Supp. 2d at 58. The court in Gold Diggers distinguished the cases the plaintiffs relied upon, Millennium Restaurants Group, Inc. v. City of Dallas, 181 F. Supp. 2d 658 (N.D. Tex. 2001), and Admiral Theatre v. City of Chicago, 832 F. Supp. 1195 (N.D. Ill. 1993) (which are the same cases the plaintiffs rely on in this case), noting that Admiral "does not . . . preclude imposing a prohibition on future protected speech as a punishment for past speech that has been adjudicated to be

-62-

illegal," 832 F. Supp. at 1205, and that, unlike Millenium, the
ordinance challenged in Gold Diggers "premises revocation on
misconduct known to the licensee, employee or operator." 469 F.
Supp. 2d at 58. Also, the court in Gold Diggers concluded that a
suspension that may not exceed 30 days is reasonable under
O'Brien's fourth prong, and that "[t]he ordinance's restrictions
on expression are cabined to those instances where a licensee
knowingly, and either repeatedly or without correction, operates
a sexually oriented business in a manner that contributes to
negative secondary effects or fails to comply with the law." Id.
The court finds the analysis in Gold Diggers equally applicable
here.

The plaintiffs argue that the ordinances impose a prior
restraint by restricting future speech based on prior
misconduct. However, "[a]n adult entertainment license may be
constitutionally withheld, suspended or revoked when the
licensee has violated valid provisions of a licensing
ordinance." Gold Diggers, 469 F. Supp. 2d at 58 (citing Schultz
v. City of Cumberland, 228 F.3d 831, 853 (7th Cir. 2000)). It is
well-established that licensing schemes, including the power to
approve, deny, revoke or suspend licenses, are constitutional so
long as they comply with constitutionally-mandated procedural
requirements. See, e.g., Littleton, 541 U.S. 774 (upholding a

adult-oriented business licensing scheme after determining that
the ordinance's procedures conformed with constitutional
requirements).

### 3. Standing to Challenge the Criminal Disability Provisions

The plaintiffs contend that the criminal disability
provisions of the statute amount to a prior restraint on speech,
arguing that "prohibiting individuals from engaging in
expressive activities because of a past criminal conviction
violates the constitutional rights of 'operators' and
'applicants.'" (Pls.' Mem. Supp. Mot. Summ. J. 32). The
plaintiffs claim to have standing because under the ordinances,
they are required to pay a licensing fee, a portion of which is
"clearly devoted to undertaking a criminal background check."
(Id. at 32 n.27.) The defendant argues that the plaintiffs lack
standing to challenge these provisions, and the court agrees.

"To establish standing to challenge [the criminal
disability provision of a sexually oriented business licensing
scheme] the individual must show both (1) a conviction of one or
more of the enumerated crimes, and (2) that the conviction or
release from confinement occurred recently enough to disable the
applicant under the ordinance." FW/PBS, 493 U.S. at 234. An

argument identical to the plaintiffs' assertion of standing was rejected in Gold Diggers.

Here, as in Gold Diggers, the plaintiffs admit that they have not been convicted of any crime relating to the criminal disability provisions. See 469 F. Supp. 2d at 53. Thus, the plaintiffs do not have standing to challenge this provision

Therefore, the plaintiffs' motion for summary judgment on the First Amendment prior restraint claim is being denied, and the defendant's motion for summary judgment on the First Amendment prior restraint claim is being granted.

### F.   __Fifth Amendment – Takings__

The defendant moves for summary judgment on the plaintiffs' Takings claim. The plaintiffs contend that the buffer zone and the reconfiguration requirement are unconstitutional takings in violation of the Fifth Amendment. The plaintiffs assert that the City is not entitled to summary judgment on the Takings claim because the ordinances' requirements would "essentially put them out of business." (Pls.' Resp. Def.'s Mot. Summ. J. 50.)

The Takings Clause of the Fifth Amendment provides that no "private property shall be taken for public use, without just compensation." U.S. Const. Amend. V. The clause applies to the states through the Fourteenth Amendment. See Kelo v. New London, 545 U.S. 469, 472 n.1 (2005).

The law recognizes two species of takings: physical takings and regulatory takings. Physical takings (or physical invasion or appropriation cases) occur when the government physically takes possession of an interest in property for some public purpose.... [R]egulatory takings... do not involve a categorical assumption of property. The gravamen of a regulatory taking claim is that the state regulation goes too far and in essence "effects a taking."

Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 374 (2d Cir. 2006).

The plaintiffs have not identified a specific property interest affected by the ordinances, nor have they advanced an argument as to why that interest is a protectable property interest pursuant to the Fifth Amendment. See Gammoh v. City of La Habra, 395 F.3d 1114, 1122 (9th Cir. 2005) ("The takings clause of the Fifth Amendment protects private property from being taken for public use without just compensation. 'In order to state a claim under the Takings Clause, a plaintiff must first demonstrate that he possesses a property interest that is constitutionally protected.' The Appellants have not here pointed to a 'property interest' interfered with by the City of La Habra's regulation of the dancers' conduct. The district court thus properly dismissed the Appellants' takings claim." (internal citations and emphasis omitted)).

Assuming arguendo that the plaintiffs' protectable property interest is in the continued economic viability of their

-66-

property, "we weigh three factors to determine whether the interference with property rises to the level of a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Buffalo Teachers Fed., 464 F.3d at 375 (quoting Connoly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224 (1986)). There is a "heavy burden placed upon one alleging a regulatory taking." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 493 (1987). Furthermore, a regulatory taking will not be found where a plaintiff "retains an 'economically viable' use of its property." Hertz Corp. v. New York City, 1 F.3d 121, 132 (2d Cir. 1993); see also Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 138 n.36 (1978) ("We emphasize that our holding [that no taking has occurred] . . . is based on Penn Central's present ability to use the Terminal for its intended purposes and in a gainful fashion. . . . if appellants can demonstrate at some point in the future that circumstances have so changed that the Terminal ceases to be 'economically viable,' appellants may obtain relief."); Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992) (recognizing a regulatory taking occurs when a "regulation denies all economically beneficial or productive use

of land"). Additionally, "the submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable." Penn Cent. Transp. Co., 438 U.S. at 130.

Here, the plaintiffs' evidence of economic impact falls into two categories: first, that the cost of compliance with the regulations is prohibitive, and second, that the reduced usable space in their respective facilities as a result of the ordinance's requirements will result in a loss of profits. This evidence, however, could not establish that Keepers and After Dark have been deprived of all economically viable use of their land. "That the plaintiffs may not profit as much as they would otherwise is of no consequence." 2284 Corp. v. Shiffrin, 98 F. Supp. 2d 244, 251 (D. Conn. 2000) (citing Federal Home Loan Mortg. Corp. v. N.Y. State Div. of Housing and Cmty. Renewal, 83 F.3d 45, 48 (2d Cir. 1996)).

Thus, no taking has occurred, and the defendant's motion for summary judgment on the Takings claim is being granted.

## G.   Substantive Provisions

### 1.   Licensing Fees

The plaintiffs contend that the licensing fees in the ordinances are an unconstitutional tax on protected expression.

-68-

A license fee is constitutional if it is "not a revenue tax, but one to meet the expense incident to the administration of the [licensing statute] and to the maintenance of public order in the matter licensed." Cox v. New Hampshire, 312 U.S. 569, 577 (1941) (internal quotation marks omitted); see also Nat'l Awareness Found. v. Abrams, 50 F.3d 1159, 1165 (2d Cir. 1995) ("[F]ees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible."). Thus, "[l]icensing fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose." E. Conn. Citizens Action Grp. v. Powers, 723 F.2d 1050, 1056 (2d Cir. 1983). Furthermore, "enforcement costs may be considered in assessing the constitutionality of a licensing fee under the First Amendment." Abrams, 50 F.3d at 1165 (citing United States Labor Party v. Codd, 527 F.2d 118, 119-20 (2d Cir. 1975)).

Under the 2003 ordinance, the initial fee for an adult oriented establishment license, to be submitted with the license application, is $750. See § 2.3-6 (2003). If the application is denied, half of the fee is returned to the unsuccessful applicant. See id. The license renewal fee, to be submitted with the license renewal application, is $500. See id. If the renewal

-69-

application is denied, half of that fee is returned. See § 2.3-7(2) (2003).

Under the 2007 ordinance, the initial fee for a sexually oriented business license, to be submitted with the license application, is $250. See chs. 2.3-6 and 2.3-4(c) (2007). The annual license renewal fee, to be submitted with the license renewal application, is $100. See § 2.3-6 (2007). The initial fee for an employee license is $150 with an annual renewal fee of $50. See id.

The plaintiffs argue that the licensing fees are unconstitutionally excessive. They argue that (a) the provision for refunding 50% of the fee upon denial of an application for a license demonstrates that the refunded portion of the fee is intended by the City as a tax for permission to engage in protected activity, and (b) the City's decision to reduce the fee in the 2007 ordinance constitutes an admission by the City that the 2003 fee was excessive.

The City estimates that it would cost $274.70 to process each adult oriented business application, $325.44 to conduct inspections of each business each year, $109.88 for a license denial/appeal hearing, and $940.00 to hire an attorney for the police chief/City for the hearing. The City has shown that the estimated costs of administering and enforcing of the ordinance

are reasonable, and the court concludes as to each ordinance that in light of those costs, the license fee is a nominal fee that serves the legitimate purpose of defraying the expenses incident to the administration and enforcement of the ordinance.

Therefore, the plaintiffs' motion for summary judgment as to the licensing fees is being denied, and the defendant's motion for summary as to the licensing fees is being granted.

### 2.   Penalty Provisions

The plaintiffs argue that the penalty provisions of the 2003 and 2007 ordinances[20] violate the state enabling statute, Conn. Gen. Stat. § 7-148(c)(10),[21] by not providing for

---

[20] Section 2.3-10 (2003 ordinance): "1. Any person, partnership or corporation who is found to have violated this ordinance shall be fined a definite sum not exceeding Ninety ($90.00) Dollars for each such violation. 2. Each violation of this ordinance shall be considered a separate offense, and any violation continuing more than one hour of time shall be considered a separate offense for each hour of violation."

Section 2.3-15 (2007 ordinance): "[A] person who knowingly violates, disobeys, omits, neglects, or refuses to comply with or resists the enforcement of any of the provisions of this Chapter shall be fined a definite sum not exceeding ninety dollars ($90.00) for each violation. Each violation of this Chapter shall be considered a separate offense, and any violation continuing more than one hour of time shall be considered a separate offense for each hour of violation."

[21] Conn. Gen. Stat. § 7-148(c)(10) provides that a municipality "shall have the power to":

Make all lawful regulations and ordinances in furtherance of any general powers as enumerated in this section, and prescribe penalties for the violation of the same not to exceed one hundred dollars, unless otherwise specifically provided by the general statutes. Such regulations and ordinances may be enforced by citations issued by designated municipal officers or employees, provided the regulations and ordinances have been designated specifically by the municipality for enforcement by

-71-

enforcement by citation. In Gold Diggers, the court concluded that Conn. Gen. Stat. § 7-148(c)(10) does not require enforcement of municipal ordinances by citation. See 496 F. Supp. 2d at 62-63 (concluding that the word "may" in Conn. Gen. Stat. § 7-148(c)(10), signifies a discretionary, rather than mandatory, power to enforce an ordinance through citation). The court finds Gold Diggers persuasive authority and likewise concludes that the penalty provisions of the 2003 and 2007 ordinances need not provide for enforcement by citation to be in compliance with Conn. Gen. Stat. § 7-148(c)(10).

Therefore, the plaintiffs' motion for summary judgment on the issue of the penalty provisions is being denied.

### 3. Ban on Entry of Minors

The plaintiffs argue that §§ 2.3-3(3)[22] and 2.3-4(3)(H)(iii)[23] of the 2003 ordinance and § 2.3-17(d)[24] of the 2007

---

citation in the same manner in which they were adopted and the designated municipal officers or employees issue a written warning providing notice of the specific violation before issuing the citation.
(Emphasis added).

[22] "No operator or employee of an adult-oriented establishment shall allow or permit any minor... to loiter in any part of such establishment including parking lots immediately adjacent to such establishment used by patrons of such adult-oriented establishment." § 2.3-3 (2003).

[23] "An applicant shall be unqualified [for an adult-oriented establishment license] if... [the] applicant has been employed in an adult oriented establishment in a managerial capacity within the preceding twenty-four (24) months and knowingly... permitted any person under the age of eighteen (18) to be in or upon the premises of an adult entertainment business...." § 2.3-4(3)(H)(iii) (2003).

ordinance, which in effect prohibit the entry of minors onto the premises of sexually oriented businesses, are unconstitutionally overbroad in that the provisions violate the right of minors to engage in protected expression. The defendant argues that the plaintiffs lack standing to challenge these provisions of the ordinances.

"A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." Farrell, 449 F.3d at 498. However, parties bringing First Amendment overbreadth challenges must still demonstrate that they have suffered an injury-in-fact pursuant to the standing requirement set forth by Article III of the Constitution. See id. at 499 ("A party may bring an overbreadth challenge where that party satisfies the Article III requirement of 'injury in fact' . . . ."). An injury-in-fact must be "concrete and particularized and . . . actual or imminent, not conjectural or hypothetical." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000); see also Pac. Capital Bank, N.A. v. Conn., 542 F.3d 341, 350 (2d Cir. 2008).

---

[24] "It shall be a violation of this Chapter for any person to knowingly allow a person under the age of eighteen (18) years on the premises of a sexually oriented business." § 2.3-17(d) (2007).

The plaintiffs have failed to demonstrate that they have suffered an injury in fact with respect to the prohibition on the entry of minors. No minor is a party to this action, nor have the plaintiffs argued or provided any evidence suggesting that they have suffered an injury as a result of these provisions.[25] The plaintiffs' sole argument with respect to the provisions prohibiting the entry of minors is that the provisions infringe the First Amendment rights of minors, and this argument, alone, is insufficient to demonstrate an injury in fact suffered on the part of the plaintiffs pursuant to the standing requirements of Article III.

Therefore, the plaintiffs' motion for summary judgment on the issue of the prohibition on the entry of minors is being denied.

---

[25] The plaintiffs do not argue or provide evidence to suggest that they even desire for minors to enter their premises. The plaintiffs have consistently described their businesses as providing entertainment to consenting adults and have not provided any evidence that even suggests that they have an interest in catering to a non-adult audience. (See Compl. ¶ 12 ("Keepers is a "a cabaret-style nightclub that features live, non-obscene, clothed and semi-nude ("topless") performance dance entertainment presented to the consenting adult public."); ¶ 15 (After Dark operates "a retail entertainment establishment that sells, exhibits, and distributes a variety of sexually explicit, but non-obscene, books, magazines, video tapes and motion picture filmfare. . . . These materials are made available in their various forms to consenting adults only."); ¶ 58 (". . . rights of those individuals from the consenting adult audience who desire to view and/or obtain the entertainment provided/made available by the Plaintiffs.").

### 4.   "No Payment" Provisions

The plaintiffs argue that the "no payment" provision of the ordinances, which prohibits employees while semi-nude from receiving pay or gratuity via direct physical contact with patrons, is a violation of the First Amendment and also a deprivation of liberty in violation of the Fourteenth Amendment.

Section 2.3-3(7)(C) of the 2003 ordinance provides:

> It shall be a violation of this Chapter for any employee, while semi-nude in an adult-oriented establishment, to knowingly or intentionally receive any pay or gratuity by direct physical contact with any patron or customer or for any patron or customer to knowingly or intentionally pay or give any gratuity by direct physical contact with any employee, while said employee is semi-nude in the adult-oriented establishment.

The 2007 version omits the language of § 2.3-3(7)(C) of the 2003 ordinance but accomplishes the same result through § 2.3-17(c), which prohibits an employee who "regularly appears semi-nude in a sexually oriented business" from "knowingly or intentionally touch[ing] a customer or the clothing of a customer on the premises of a sexually oriented business." § 2.3-17(c) (2007).

#### a.   First Amendment

The plaintiffs argue that these restrictions impermissibly burden freedom of expression because they serve as financial disincentives meant to drive disfavored expression from the

market. Specifically, the plaintiffs argue that the provision
denies erotic dancers the ability to profit from their
expression by foreclosing the possibility of receiving tips.

While the plaintiffs are correct that the government cannot
prohibit compensation for the exercise of First Amendment
rights, see, e.g., Simon & Schuster v. Crime Victims Bd., 502
U.S. 105, 115-16 (1991), the employees, however, remain free
under the ordinances to receive tips from customers via tip
jars, from a payment made to the sexually oriented business on
the employee's behalf, or remuneration from the club itself.
"Alternatively, the [sexually oriented business] could decide to
increase dancers' salaries, rather than requiring them to earn a
living wage from their tips." Deja Vu of Nashville, Inc. v.
Metro. Gov't of Nashville and Davidson Co., 274 F.3d 377, 396-99
(6th Cir. 1997).[26]

Furthermore, to the extent that the plaintiffs argue that
the direct tipping provisions will cut into their profits,
"[t]he First Amendment requires only that [the City] refrain
from effectively denying [sexually oriented business owners] a
reasonable opportunity to open and operate an adult
[establishment] within the city . . . ." Renton, 475 U.S. at 54

---

[26] To the extent that the plaintiffs claim that the tipping limitation
burdens expression, i.e., a patron's ability to express appreciation
for a dancer's performance, this argument is, for the same reasons,
without merit. See Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1062
(9th Cir. 1986).

(1986). Cases addressing ordinances similar to the one here are in accord. See Deja Vu of Nashville, Inc., 273 F.3d at 397; DLS, Inc. v. City of Cattanooga, 107 F.3d 403, 413 (6th Cir. 1997); Jake's, Ltd., Inc. v. City of Coates, 284 F.3d 884, 891 (8th Cir. 2002). Although compliance with the ordinances may cut into the plaintiffs' profits, the plaintiffs have failed to produce evidence that could show that they will not have a reasonable opportunity to operate their establishments.

### b.    *Fourteenth Amendment*

The plaintiffs argue that "by effectively prohibiting entertainers from receiving remuneration from their customers for the constitutionally protected services which they provide, and by prohibiting patrons from giving performers such compensation, Milford has unquestionably infringed on the liberty rights protected by the Fourteenth Amendment." (Pls.' Mem. Supp. Mot. Summ. J. 51.) In support of this argument, the plaintiffs rely entirely on the Supreme Court's decision in Lawrence v. Texas, 539 U.S. 558 (2003).

In Lawrence, the Supreme Court ruled unconstitutional a Texas statute which prohibited homosexuals from engaging in sexual conduct with one another. The Court stated:

> There are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that

-77-

> includes freedom of thought, belief, expression, and
> certain intimate conduct.

Id. at 562. However, as the Court made clear, Lawrence "does not

involve public conduct. . . . The case does involve two adults,

who, with full and mutual consent from each other, engaged in

sexual practices common to a homosexual lifestyle. The

petitioners are entitled to respect for their private lives."

Id. at 578. While the Court noted that "[i]t is a promise of the

Constitution that there is a realm of personal liberty which the

Government may not enter," id. (citing Planned Parenthood v.

Casey, 505 U.S. 833, 847 (1992)), it is unclear how this

statement in a case that clearly does not involve public conduct

is applicable here.

Therefore, the plaintiffs' motion for summary judgment on

the issue of the "no payment" provision is being denied.

### 5.  Buffer Zone

The plaintiffs argue that the six-foot "buffer zone"

mandated by § 2.3(7)(B) of the 2003 ordinance and § 2.3-17(b) of

the 2007 ordinance is an undue burden on expressive conduct,

violates the right to freedom of association, and violates the

fundamental right of liberty.

Section 2.3-3(7)(B) of the 2003 ordinance provides in

relevant part:

> It shall be a violation of this Chapter for a person
> to knowingly or intentionally in an adult-oriented
> establishment, appear in a semi-nude condition unless
> the person is an employee who, while semi-nude, shall
> be at least six (6) feet from any patron or customer
> and on a stage at least eighteen (18) inches from the
> floor . . . .

The 2007 ordinance contains the identical provision but adds the
additional requirement that the stage on which the employees
must remain while semi-nude must be "in a room of at least one
thousand (1,000) square feet." § 2.3-17(b) (2007).

### a.   *Power to Enact the Buffer Zone*

The plaintiffs argue that the preambles to Chapter 2.3 do
not articulate a specific rationale for the buffer zone
provision or, in the alternative, that the City's rationale for
the buffer zone is impermissibly premised on "the chance an
unlawful act will be committed 'at some indefinite future
time,'" Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245
(2002).[27] The court disagrees. It is clear from the ordinance's
stated purpose and findings in § 2.3-1 that two of the
rationales for the adoption of the buffer zone are to reduce the
secondary effects of unsanitary conditions and the potential
spread of disease, which are substantial interests of the City.
Additionally, insofar as this argument implicates reasonable

---

[27] The plaintiff's reliance on Ashcroft is misplaced as Ashcroft addressed
content-based regulation of speech, not a time, place, and manner restriction
as is at issue here. See 535 U.S. 234.

time, place, and manner restrictions under O'Brien, it has
already been rejected.

### b.    Freedom of Association

The plaintiffs argue that the buffer zone violates the
freedom of association because the government's substantial
interests can be achieved through means significantly less
restrictive, as demonstrated by other less restrictive buffer
zones upheld as constitutional by other courts, such as the
three-foot buffer zone upheld in Deja Vu of Nashville, 274 F.3d
at 396. The plaintiffs' argument is unpersuasive. First, it
should be noted that the court in Deja Vu upheld the three-foot
buffer zone by relying on its prior holding in DLS, Inc. v. City
of Chattanooga, 107 F.3d 403, 410-11 (6th Cir. 1997), which
upheld a six-foot buffer zone. Also, buffer zones of up to ten
feet have been found to be constitutional. See, e.g., Kev, Inc.
v. Kitsap County, 793 F.2d 1053, 1061-62 (9th Cir. 1986) ("While
the dancer's erotic message may be slightly less effective from
ten feet, the ability to engage in the protected expression is
not significantly impaired."); Colacurcio v. City of Kent, 163
F.3d 545, 554 (9th Cir. 1998) (rejecting later buffer zone
challenge, relying on its decision in Kev).

Second, while the Supreme Court has recognized a right to
associate for the purpose of engaging in activities protected by

-80-

the First Amendment, "[t]he right to associate for expressive purposes is not, however, absolute." Roberts v. U.S. Jaycees, 468 U.S. 609, 618 (1984); see also Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville and Davidson County, 274 F.3d 377, 396 (6th Cir. 2001), cert. denied, 535 U.S. 1073 (2002) ("We agree with the plaintiffs that the First Amendment protects the entertainers and audience members' right to free expressive association. They are certainly engaged in a 'collective effort on behalf of shared goals.' . . . The right to associate for expressive purposes, however, is not absolute...."). "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Roberts, 468 U.S. at 623. "Mere incidental burdens on the right to associate do not violate the First Amendment; rather, [t]o be cognizable, the interference with [plaintiffs'] associational rights must be 'direct and substantial' or 'significant.'" Tabbaa v. Chertoff, 509 F.3d 89, 101 (2d Cir. 2007) (internal quotations and citations omitted).

Here, the buffer zone provision is justified by the City's compelling interest in reducing public health concerns associated with close proximity between dancers and patrons. Any

interference on these associational rights that may be created by a six-foot buffer zone is neither "substantial" nor "significant". <u>Tabbaa</u>, 509 F.3d at 101. "<u>Roberts</u> does not require the government to exhaust every possible means of furthering its interest; rather, the government must show only that its interest 'cannot be achieved through means <u>significantly less restrictive</u> of associational freedoms.'" <u>Id.</u> at 105 (emphasis in original) (quoting <u>Roberts</u>, 468 U.S. at 623). The court concludes that the City's interest cannot be achieved through means significantly less restrictive of these associational freedoms.

### c. *Fundamental Right to Liberty*

The plaintiffs argue that the buffer zone restriction violates the dancers' fundamental right to liberty and privacy guaranteed by the Due Process Clause of the Fourteenth Amendment by restricting the dancers' liberty right to move from one place to another, citing <u>City of Chicago v. Morales</u>, 527 U.S. 41 (1999), and their right to intimate conduct, citing <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003). However, the plaintiffs' reliance on <u>Morales</u> is misplaced because the Court in <u>Morales</u> acknowledged a "right to remove from one place to another," not a right to be in any location. <u>Morales</u>, 527 U.S. at 53; <u>see also</u> <u>Williams v. Town of Greenburgh</u>, 535 F.3d 71, 75 (2d Cir. 2008) ("it is clear

that the right" to intrastate travel "protects movement between places and has no bearing on access to a particular place" (emphasis in original)). In addition, the plaintiffs' reliance on Lawrence is misplaced because Lawrence did not recognize a broad right to engage in sexual or intimate conduct outside of private settings. See Lawrence, 539 U.S. at 578 (2003).

### d.   Freedom of Expressive Conduct

The plaintiffs argue that the buffer zone burdens more speech than is necessary to serve the relevant government interests because the buffer zone "floats." The plaintiffs argue that the six-foot distance would prevent the entertainers from communicating their message from a normal conversational distance and would interfere with their dancing because the dancers would be preoccupied with maintaining the distance between themselves and numerous patrons.

Floating buffer zones can burden more speech than is necessary to serve the relevant governmental interests when they create a "lack of certainty" that "leads to a substantial risk that much more speech will be burdened than the [ordinance] by its terms prohibits," and when they prevent speakers from "communicating a message from a normal conversational distance." Schenck v. Pro-Choice Network Of W.N.Y., 519 U.S. 357, 377-78 (1997); see also U.S. v. Scott, 187 F.3d 282, 288-89 (2d Cir.

-83-

1999); N.Y. ex rel. Spitzer v. Operation Rescue Nat'l, 273 F.3d 184, 204 (2d Cir. 2001) (holding that a buffer zone was unconstitutional, in part because it prevented protesters from communicating at a normal conversational distance).

While the ordinances' buffer zone "floats" in that it surrounds the dancers, the court concludes that the buffer zone would not burden more speech than necessary to serve the City's substantial interests in preventing unsanitary conditions and the potential spread of disease. First, any lack of certainty that the buffer zone would create is minimal and maintaining six feet of separation "would not be difficult to accomplish" because the buffer zone only exists around dancers when they are on stage. Shenck, 519 U.S. at 378. Thus, the sexually oriented business could create a six-foot buffer around the edge of the stage, allowing the dancers to dance freely on any portion of the stage or could create a six-foot buffer by marking the portions of the stage on which the dancers could dance freely.

Furthermore, the buffer zone would not prevent the dancer from communicating at a normal conversational distance. The dance can be communicated easily between dancer and patron from a distance of six feet. See Hill v. Colorado, 530 U.S. 703, 726-27 (2000) (holding that an eight-foot separation between a speaker and his or her audience "should not have any adverse

-84-

impact on the readers' ability to read signs displayed by demonstrators" and thus the eight-foot zone allows the speaker to communicate at a "normal conversational distance."); Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1061-62 (9th Cir. 1986) ("While the dancer's erotic message may be slightly less effective from ten feet, the ability to engage in the protected expression is not significantly impaired."). Thus, the court concludes that the fact that the ordinances' buffer zone floats does not implicate the concerns associated with floating buffer zones.

Therefore, the plaintiffs' motion for summary judgment on the issue of the buffer zone provision is being denied, and the defendant's motion for summary judgment on the issue of the buffer zone provision is being granted.

### 6.   "No Touch" Provision

The plaintiffs challenge the "no touch" provision of the ordinances as impermissibly overbroad and in violation of the rights to freedom of association and substantive due process.

Section 2.3-3(7)(D) of the 2003 ordinance provides:

It shall be a violation of this Chapter for any employee, while semi-nude in an adult-oriented establishment, to knowingly or intentionally touch a customer or the clothing of a customer.

-85-

Section 2.3-17(c) of the 2007 ordinance expands the prohibited

conduct to include physical contact between certain employees

and customers, regardless of the state of dress of those

employees at the time of the contact:

> It shall be a violation of this Chapter for any employee
> who regularly appears semi-nude in a sexually oriented
> business to knowingly or intentionally touch a customer or
> the clothing of a customer on the premises of a sexually
> oriented business.

Section 2.3-17(c) (2007).

An identical argument was made in Gold Diggers and rejected

there. See Gold Diggers, 469 F. Supp. 2d at 63-65. The court

finds Gold Diggers persuasive authority on this issue.

Therefore, the plaintiffs' motion for summary judgment on

the issue of the "no touch" provision is being denied, and the

defendant's motion for summary judgment on the issue of the "no

touch" provision is being granted.

### 7.  Public Posting

The plaintiffs argue that § 2.3-4(5) of the 2003 ordinance

and § 2.3-5(c) of the 2007 ordinance, which require that a

sexually oriented business post its license "in a conspicuous

place at or near the entrance to the sexually oriented

business," violate their First Amendment right to engage in

speech anonymously. Specifically, the plaintiffs argue that the

ordinances violate that right because the ordinances require

that the names of the person or persons to whom a license is granted appear on the face of the license and require that the license be posted publicly. The defendant contends that the public posting requirements do not run infringe the plaintiffs' First Amendment rights. The court concludes that the 2003 ordinance's public posting requirement is constitutional, and that the 2007 public posting requirement is unconstitutionally overbroad.

The Supreme Court has recognized a right to anonymous speech grounded in the First Amendment freedoms of speech and association. See, e.g., NAACP v. Alabama, 357 U.S. 449, (1958) (holding that the State of Alabama could not compel the NAACP to reveal to the State's Attorney General lists of its members' names and addresses); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995) (invalidating an Ohio statute that prohibited the distribution of anonymous campaign literature); Talley v. California, 362 U.S. 60 (1960) (invalidating a Los Angeles ordinance that prohibited the distribution of handbills without the names and addresses of persons who prepared, distributed, or sponsored the handbills); Bates v. City of Little Rock, 361 U.S. 516 (1960) (upholding the NAACP's refusal to provide the names of its members to municipal tax officials); Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 200 (1999)

(holding that the First Amendment was violated by a Colorado

statute requiring persons who circulated petitions for an

initiative to wear identification badges revealing their names).

However,

> [w]hile the First Amendment protects the rights of
> citizens to express their viewpoints, however
> unpopular, it does not guarantee ideal conditions for
> doing so, since the individual's right to speech must
> always be balanced against the state's interest in
> safety, and its right to regulate conduct that it
> legitimately considers potentially dangerous.

Church of American Knights of the Ku Klux Klan v. Kerik, 356

F.3d 197, 209 (2d Cir. 2004) (citing Arcara v. Cloud Books,

Inc., 478 U.S. 697, 706 (1986)).

"[C]ompelled disclosure, in itself, can seriously infringe

on privacy of association and belief guaranteed by the First

Amendment." Buckley v. Valeo, 424 U.S. 1, 64 (1976). However,

such disclosure is justified to further a substantial government

interest when there is a "relevant correlation" or "substantial

relation" between the governmental interest and the information

required to be disclosed. Id.; see also John Doe No. 1 v. Reed,

--- U.S. ---, 130 S.Ct. 2811, 2818 (2010). To meet this

standard, "the strength of the governmental interest must

reflect the seriousness of the actual burden on First Amendment

rights." governmental interest must reflect the seriousness of

the actual burden on First Amendment rights." John Doe No. 1,

130 S. Ct. at 2814 (quoting Davis v. Federal Election Comm'n, 554 U.S. 724, 744 (2008).)

### a. *2003 Ordinance*

Section 2.3-4(5) of the 2003 ordinance requires that "[t]he license, if granted, shall state on its face the name of the person or persons to whom it is granted, the expiration date, and the address of the adult-oriented business" and "shall be posted in a conspicuous place at or near the entrance to the adult-oriented business so that it may be easily read at any time." § 2.3-4(5) (2003). The "person or persons to whom [the license] is granted", in other words, the license applicants, includes "operators" and "any persons directly involved in the management and control of the adult-oriented establishment." § 2.3-4(3) (2003). "Operators" are defined as "any person, or any proprietor, shareholder, general partner or limited partner who participates in the management or day-to-day operations and/or control of the establishment." § 2.3-2(14) (2003). Pursuant to § 2.3-5, if the applicant is an "enterprise" the applicant "shall designate an officer or partner as applicant." § 2.3-5 (2003).

The City argues that it has a substantial interest in "regulating those who control and operate sexually oriented businesses." The purpose of its public posting requirement, as

-89-

stated on the face of the requirement, is "so that [the license] may be read at any time." § 2.3-4(5) (2003). The City argues that the requirement that the license holder's name be stated on the license and posted publicly furthers the government's substantial interest in enforcing the ordinance by allowing City officials and law enforcement agents to readily identify those who are responsible for the operation of a sexually oriented business for purposes of routine inspections and criminal investigations.

The court concludes that the City has a substantial interest in enforcing its ordinance, and also concludes that there is a substantial relation between the City's interest in being able to readily identify the names of the people who control and operate the business so the City knows who to contact for purposes of enforcing the ordinance, and the name of the license holder, who pursuant to §§ 2.3-4(3) and 2.3-5, manages, operates or controls the establishment. See Acorn Inv., Inc. v. City of Seattle, 887 F.2d 219, 226 (9th Cir. 1989) (regulating the protected activity is a legitimate and substantial governmental interest); E. Brooks Books, Inc. v. City of Memphis, 48 F.3d 220, 226 (6th Cir. 1995) (city has a legitimate interest in identifying those who are legally accountable for the operation of a sexually oriented business);

Genusa v. City of Peoria, 619 F.2d 1203, 1216-17 (7th Cir. 1980) (enforcement of ordinance provisions is a legitimate and substantial government interest); Brownell v. City of Rochester, 190 F. Supp. 2d 472, 502 (W.D.N.Y. 2001) (city has a substantial interest in knowing who is actually running or otherwise responsible for the operation of sexually oriented businesses).

### b. 2007 Ordinance

Section 2.3-5(c) of the 2007 ordinance requires that the "license shall be posted in a conspicuous place at or near the entrance to the sexually oriented business so that it may be read at any time that the business is occupied by patrons or is open to the public."

Section 2.3-4(d) of the 2007 ordinance requires, in relevant part, that "each person with an influential interest in the sexually oriented business or in a legal entity that controls the sexually oriented business shall sign the application for a license as applicant." The ordinance in turn defines "influential interest" as:

> (1) the actual power to operate the sexually oriented business or control the operation, management or policies of the sexually oriented business or legal entity which operates the sexually oriented business, (2) ownership of a financial interest of thirty percent (30%) or more of a business or of any class of voting securities of a business, or (3) holding an office (e.g., president, vice president, secretary, treasurer, managing member, managing director, etc.)

-91-

in a legal entity which operates the sexually oriented
business.

§ 2.3-2 (2007).

The court concludes that the City's substantial interest in
the posting requirement is the same as it was with respect to
the 2003 ordinance, because the City has an interest in
enforcing the ordinance. However, the court concludes that the
scope of the posting provision is unconstitutionally broad
because there is not a substantial relationship between the
governmental interest and the information required to be posted.
While requiring the posting of the names of the individuals who
manage, operate and/or control a sexually oriented business is
substantially related to enforcement of the ordinance, posting
the names of individuals based merely on their status as a 30%
shareholder or an officer not involved in the management,
operation or control of the sexually oriented business is not
substantially related to the City's interest in enforcing the
ordinance. See Lady J. Lingerie, Inc. v. City of Jacksonville,
176 F.3d 1358, 1367 (11th Cir. 1999) ("[S]tockholders, qua
stockholders, do not run corporations; officers and directors
do. The City can enforce its rules through them."); Acorn Inv.,
Inc. v. City of Seattle, 887 F.2d 219, 225-26 (9th Cir.
1989)("Because officers and directors, not shareholders, are

legally responsible for the management of a corporation's business," there was "no logical connection between the City's legitimate interest in compliance with the . . . ordinance and the rule requiring disclosure of the names of shareholders."); E. Brooks Books, 48 F.3d at 226 ("We agree that the City has a legitimate interest in identifying those who are legally accountable for the operation of a sexually oriented business, and perhaps those who have a controlling or significant share in such a business. The requirement that every person with any ownership interest, regardless of how small, sign the application, however, is impermissibly broad."); Genusa v. City of Peoria, 619 F.2d 1203, 1216-17 (7th Cir. 1980) (invalidating an ordinance requiring all stockholders owning more than 10% of the stock of an applicant to submit various personal data to licensing officials). Thus, the court concludes that § 2.3-5(c) of the 2007 ordinance is unconstitutional to the extent that it requires the posting of the names of individuals who do not manage, operate or control the sexually oriented business.

Therefore, the plaintiffs' motion for summary judgment on the issue of the public posting requirement is being denied as to the 2003 ordinance and granted as to the 2007 ordinance.

### 8.   Administrative Inspection

The defendant moves for summary judgment on the claim that the periodic administrative inspections required by § 2.3-3(6) of the 2003 ordinance[28] and § 2.3-7 of the 2007 ordinance[29] violate the Fourth Amendment right against unreasonable searches and unconstitutionally condition a grant of a governmental privilege upon the waiver of constitutional rights in violation of the First and Ninth Amendments. The plaintiffs have not responded to the defendant's motion for summary judgment on any of these claims, and the court deems them abandoned. See Carone v. Mascolo, 573 F. Supp. 2d 575, 591 ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (quoting Taylor v. City of New York,

---

[28] "The operator shall insure compliance of the adult-oriented establishment and its patrons with the provisions of this ordinance. Adult-oriented establishments and their employees shall permit officers or guests of the City to inspect, from time to time on an occasional basis, the portions of the sexually oriented business premises where any patron is permitted, for the purpose of ensuring compliance with this Chapter, during those times when the sexually oriented business is occupied by patrons or is open for business." § 2.3-3(6) (2003).

[29] "Sexually oriented businesses and sexually oriented business employees shall permit the Administrator and his or her agents to inspect, from time to time on an occasional basis, the portions of the sexually oriented business premises where patrons are permitted, for the purpose of ensuring compliance with the specific regulations of this Chapter, during those times when the sexually oriented business is occupied by patrons or is open to the public. This section shall be narrowly construed by the City to authorize reasonable inspections of the licensed premises pursuant to this Chapter, but not to authorize a harassing or excessive pattern of inspections." § 2.3-7 (2007).

269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)); see also Bronx Chrysler

Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249

(S.D.N.Y. 2002) (dismissing breach of contractual duty of good

faith claim as abandoned because plaintiff's summary judgment

opposition papers made no argument in support of the claim at

all).

Therefore, the defendant's motion for summary judgment on

the issue of the periodic administrative inspections is being

granted.

### 9.   Conn. Gen. Stat. § 8-2

The City contends that it is entitled to summary judgment

on the claim that §§ 2.3-13 and 2.3-17(b)[30] of the 2007

ordinance, which regulate the interior configuration of sexually

oriented businesses, violate § 8-2 of the Connecticut General

Statutes. Section 8-2(a) provides in relevant part that "zoning

regulations . . . shall not prohibit the continuance of any

nonconforming use, building or structure existing at the time of

the adoption of such regulations." Conn. Gen. Stat. § 8-2(a).

The plaintiffs claim that § 2.3-13 and § 2.3-17(b) violate their

right under Conn. Gen. Stat. § 8-2 to continue a non-conforming

---

[30] Section 2.3-17(b) provides, in relevant part, that employees, "while semi-nude" must "remain... on a stage at least eighteen (18) inches from the floor in a room of at least one thousand (1,000) square feet." Where the plaintiffs in the complaint and their briefing refer to the language of § 2.3-17(b) as § 2.3-18(b), the court assumes that the plaintiffs meant to refer to § 2.3-17(b).

structure because the ordinance would require the plaintiffs to make substantial renovations to their existing buildings to be in compliance with the ordinance.

The City argues that Conn. Gen. Stat. § 8-2 governs only municipal zoning regulations, that the 2007 ordinance is not a zoning ordinance, and consequently Conn. Gen. Stat. § 8-2 is inapplicable. The plaintiffs argue that § 8.2 grants a right to continue non-conforming uses that is not limited to the context of zoning ordinances. The court concludes that any right to continue non-conforming uses granted by Conn. Gen. Stat. § 8-2 is limited to the context of zoning ordinances, and that the 2007 ordinance is not a zoning ordinance so Conn. Gen. Stat. § 8-2 is inapplicable.

Connecticut law recognizes the distinction between zoning regulations and general police power regulations. See State ex rel. Spiros v. Payne, 131 Conn. 647, 652 (1945) (determining whether town regulation was "a part of the general plan of zoning" or "an independent police regulation"); O'Meara v. City of Norwich, 167 Conn. 579, 583 (1975) ("There is a distinction, however, between the council acting in its general legislative capacity and promulgating independent police regulations, and acting in its capacity as a zoning authority.").

The Connecticut Supreme Court defines zoning as "a general plan to control and direct the use and development of property in a municipality or a large part of it by dividing it into districts according to the present and potential use of properties." State ex rel. Spiros v. Payne, 131 Conn. 647, 652 (1945). To determine whether a municipal ordinance is a zoning ordinance, the court looks to "the nature and purpose of the ordinance, its relation to the general plan of zoning in the city, its provisions and the terms it uses." Id. The 2007 ordinance does not divide the City into districts, nor does it contain any locational restrictions on sexually oriented businesses. As noted, its function is to regulate sexually oriented businesses throughout the municipality by a licensing procedure. Thus, the 2007 ordinance is not a zoning ordinance and is not governed by Conn. Gen. Stat. § 8-2(a). See Gold Diggers, 469 F. Supp. 2d at 66; VIP of Berlin, LLC v. Town of Berlin, 50 Conn. Supp. 542, 560 (2007), aff'd, 287 Conn. 142 (2008) (where an ordinance's locational restrictions did not divide the town into districts and the purpose of the ordinance is to regulate sexually oriented businesses throughout the town by a licensing procedure, the ordinance was not a zoning ordinance but was a regulation of adult uses pursuant to the town's legitimate police power).

-97-

Therefore, the defendant's motion for summary judgment on the claim that the ordinances violate Conn. Gen. Stat. § 8-2 is being granted.

## IV.  CONCLUSION

The plaintiffs' Motion for Partial Summary Judgment (Doc. No. 49) is hereby GRANTED in part and DENIED in part. The plaintiffs' motion for summary judgment is being granted with respect to the public posting requirement of the 2007 ordinance, and denied in all other respects.

The Defendant's Motion for Summary Judgment (Doc. No. 53) is hereby GRANTED in part and DENIED in part. The defendant's motion for summary judgment is being granted in all respects except with respect to the public posting requirement of the 2007 ordinance.

It is so ordered.

Dated this 30th day of March, 2013, at Hartford, Connecticut.


                              /s/AWT_____
                           Alvin W. Thompson
                      United States District Judge